Joseph F. Leeson, Jr., United States District Judge
I. Introduction
Brandon Charleston has filed a counseled Petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He is challenging his August 2009 conviction for murder in the first degree and possession of an instrument of crime, following a trial by jury before the Honorable George W. Overton in the Court of Common Pleas of Philadelphia County. ECF No. 1. The charges arose from the June 15, 2008 shooting death of William Stanton inside the residence located at 2428 North 25th Street in Philadelphia. In September 2009, Judge Overton sentenced Charleston to life imprisonment for the murder and a concurrent term of 3 to 24 months' imprisonment for the weapons offense.
Upon review of Charleston's Petition, United States Magistrate Elizabeth T. Hey issued a Report and Recommendation (R & R) recommending that the Petition be denied. ECF No. 21. Charleston timely filed objections to the R & R. ECF No. 24. After de novo review and for the reasons set forth below, the R & R is adopted in part and the Petition is denied.
II. Factual and Procedural History
The Court adopts the factual and procedural history as summarized by Magistrate Judge Hey in the R & R, as there are no objections to this portion of the R & R.
III. Standard of Review
12 When objections to a report and recommendation have been filed under 28 U.S.C. § 636(b)(1)(C), the district court must make a de novo review of those portions of the report to which specific objections are made. Sample v. Diecks, 885 F.2d 1099, 1106 n.3 (3d Cir. 1989) ; Goney v. Clark, 749 F.2d 5, 6-7 (3d Cir. 1984) ("providing a complete de novo determination where only a general objection to the report is offered would undermine the efficiency the magistrate system was meant to contribute to the judicial process"). "District Courts, however, are not required to make any separate findings or conclusions when reviewing a Magistrate Judge's recommendation de novo under 28 U.S.C. § 636(b)." Hill v. Barnacle, 655 Fed.Appx. 142, 147 (3d Cir. 2016). The district court "may accept, reject, or modify, in whole or in part, the findings and recommendations" contained in the report. 28 U.S.C. § 636(b)(1)(C) (2009).
IV. Analysis
Charleston's Petition presents five claims for relief. First, he contends that the Pennsylvania courts acted contrary to clearly established federal law, under Miranda[2] , in allowing the admission at trial *618 of a statement he made to a detective while in custody. Second, he contends that the admission of evidence of his tattoo deprived him of a fundamentally fair trial. Charleston's third, fourth, and fifth claims each assert the ineffective assistance of trial counsel. Specifically, he claims he was deprived of effective assistance of counsel when his counsel (1) failed to request a proper instruction to the jury regarding the hearsay testimony of a witness; (2) failed to object when, in the course of the trial judge's closing instructions to the jury, the judge advised the jury that Charleston's "reputation for telling the truth is bad"; and (3) failed to ask that the jury be instructed as to the possible verdict of involuntary manslaughter.
The Magistrate Judge, in her R & R, recommended denying relief on each of these five claims. Charleston's Statement of Objections to the R & R presents five objections, or sets of objections, to the Magistrate Judge's analysis of each claim. The Court addresses Charleston's objections in turn. As explained below, although the Court agrees with the Magistrate Judge that Charleston is not entitled to relief on any of the five grounds presented in his Petition, the Court departs from the R & R's analysis in some respects and, accordingly, adopts the R & R in part.
A. Objection One, concerning the admission of Charleston's statement, is overruled.
i. Introduction
Charleston's first objection to the R & R concerns the admissibility of a statement he made to Homicide Detective Greg Singleton. As explained in detail below, Charleston was taken into police custody the evening of July 16, 2009, and was questioned by Detective Singleton the following morning. After obtaining some biographical information from Charleston, the detective asked Charleston about the circumstances of Stanton's death, and Charleston "described his involvement in the incident." The detective then provided the Mirandawarnings to Charleston and took a formal statement from him, which the detective transcribed.
In a pretrial motion, Charleston moved to suppress his formal post-warning statement,[3] arguing that it was coerced in violation of Miranda. After a suppression hearing, the motion was denied, and the post-warning statement was read into the record during the trial. The Pennsylvania Superior Court affirmed the trial court's ruling that the statement was admissible.
In his present Petition, Charleston contends that Detective Singleton deliberately withheld the Miranda warnings until after he had obtained a confession (i.e., the initial, pre-warning statement) and that the formal, post-warning statement was therefore inadmissible under the rule established by the United States Supreme Court in the case of Missouri v. Seibert, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004). The Magistrate Judge, in the R & R, found that Charleston's statement was admissible under Seibert and that Charleston was not entitled to relief on this claim. Charleston objects to this analysis and contends that Seibert, properly understood, renders his formal, post-warning statement inadmissible.
ii. Factual and procedural background
The factual background of Charleston's statement is as follows. Around 9:00 p.m. on July 16, 2008, approximately one month after William Stanton's death, Philadelphia *619 Police Officer Anthony Soliman and his partner, responding to a 911 call concerning the presence of a homicide suspect in the area, drove to 25th and Hagert Streets, where they encountered Charleston, who matched the description of the suspect. Suppression Hearing, N.T., Aug. 17, 2009, at 8-34 (hereinafter "Suppr. N.T."). The officers told Charleston that they needed to ask him some questions but that he was not under arrest, and they asked him to sit in their police car. Id.at 10, 30. Charleston agreed to do so. Id.at 10, 30. While Charleston was sitting in the car, Clara Stanton, the mother of the victim, approached the officers and told them that she was the one who had called 911 and that Charleston had murdered her son, William Stanton. Id.at 12-13. Officer Soliman asked Charleston what he knew about William Stanton, and Charleston stated that he knew nothing. Id.at 14, 39, 43-44. Officer Soliman then called the Homicide Unit, and Detective Singleton, who had been investigating the Stanton murder, told Officer Soliman to handcuff Charleston and bring him to the station. Id.at 14, 80; Trial N.T., Aug. 24, at 5-12.[4] Officer Soliman told Charleston that some detectives wanted to talk to him, and the officers brought Charleston to the Homicide Unit of the police station, where they arrived at about 9:35 p.m. Suppr. N.T. at 33, 36.
After Charleston was brought to the station, Officer Soliman, along with Detective Singleton, took Charleston into an "interview room." Id.at 35, 52, 79. Officer Soliman did not know if the door was locked, but both Officer Soliman and Detective Singleton acknowledged that Charleston was not free to leave at that point. Id.at 35, 80.
Detective Singleton testified that after he helped place Charleston in the interview room that evening, he briefly spoke with Charleston but declined to interview him at that time because he appeared to be "under the influence of either alcohol or some narcotics substance." Id.at 51-53. Detective Singleton did not mention to Charleston anything about the Stanton killing. Id.at 54. The detective left Charleston alone in the room at about 10:00 p.m. and did not see him again until 10:00 a.m. the next morning. Id.at 78-79, 88.
At 10:00 a.m. the next morning, Detective Singleton, along with another detective, returned to the interview room where Charleston had been placed. Detective Singleton observed that Charleston "appeared to be sober and more coherent," and he gave him a cheese sandwich and water. Id.at 54, 90. He began asking Charleston biographical questions in order to fill out a biographical form. Id.at 54. Charleston was cooperative in answering these questions. Id.at 55. After Detective Singleton completed the biographical form, he "asked [Charleston] about the circumstances surrounding the murder of William Stanton, and [Charleston] explained in *620 some detail what occurred in the house." Id.at 56. Detective Singleton testified that when he first started speaking to Charleston about the incident, Charleston "was immediately receptive." Id.at 71.[5]
Detective Singleton testified that, after Charleston explained what occurred in the house, "[a]t some point, I stopped [Charleston] and read him his rights and prepared the memorandum form for...the sheets, the warnings for his rights, and he signed off on them." Id.at 56.[6] Specifically, Detective Singleton used a "75-331 form," which "reflects the warnings and the information on who's being interviewed, the date, time, location, who's interviewing and who's present at the time of the interview." Id.at 57. Detective Singleton testified that, as reflected on the form, he read a series of warnings to Charleston concerning his rights to remain silent and to have an attorney, and Charleston provided his signature or initials under each warning, signifying that he understood his rights. Id.at 57-60.
Detective Singleton testified that he provided the Miranda warnings to Charleston at approximately 10:20 a.m. See Trial N.T., Aug. 21, at 160.[7] After Charleston signed the forms waiving his Miranda rights, Detective Singleton "then proceeded to take a statement from [Charleston], a formal statement." Suppr. N.T. at 56. In so doing, Detective Singleton asked Charleston a series of questions about the shooting, and the detective transcribed the questions and answers onto the above-mentioned 75-331 form, after which Charleston reviewed and signed the form, as well a "statement adoption attestation form." Id.at 56-70. The interview was completed at 12:20 p.m. Id.at 69. Detective Singleton testified that Charleston "seemed very cooperative and eager to tell his portion of the story" during the course of making his statement. Id.at 70. The interview was completed at 12:20 p.m., about two hours and twenty minutes after it had begun. Id.Later that day, Charleston was formally arrested for Stanton's murder. Id.at 71.
In Charleston's formal statement, which Detective Singleton read into the record during the suppression hearing and at trial, Charleston stated that on June 15, the day of the shooting, he and Stanton were standing outside on the street "talking about the Xanies" (Xanax pills) that Charleston wanted to buy from Stanton, when they decided to enter the residence on 2428 North 25th Street to conduct the transaction. Id.at 62, 65, 66. After they entered the residence, they began to argue about the pills, at which point, according to Charleston's statement, "[Stanton] pulled out the gun and I started rustling with him over the gun. While I was rustling with him, the gun went off about three times. I took the gun and left the house threw it *621 into the sewer right on the corner of [25th] Street." Id.at 63. Charleston stated that the gun was "in both of our hands" when the shots were fired. Id.He added that "[i]t was self-defense" and "[i]t's not like I pointed it at him and shot him or nothing like that." Id.at 69.
Before trial, Charleston moved to suppress his formal, post-warning statement, arguing that, among other things, he was subjected to coercive conditions when he was kept in the interview room overnight. Id.at 105. The trial judge held a suppression hearing, at the conclusion of which he denied the motion, finding that the Miranda warnings were properly given, that there was "no evidence of coercion," and that, on the contrary, there was evidence of a lack of coercion, "given the provisions of food and the ability to sleep to ward off the effects of substances which caused the intoxication."Id.at 115-19.
3 On direct appeal, the Pennsylvania Superior Court affirmed the trial court's denial of Charleston's motion to suppress his statement. See Com. v. Charleston, 16 A.3d 505 (Pa. Super. Ct. 2011), abrogated on other grounds byIn re L.J., 622 Pa. 126, 79 A.3d 1073 (2013). In his present Petition, Charleston contends that the Pennsylvania courts' determination that his statement was admissible at trial was contrary to clearly established federal law, particularly as set forth by the United States Supreme Court in the case of Missouri v. Seibert, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004).[8]
iii. United States Supreme Court case law on "two-step interrogations"
The interrogation at issue in this case is an example of what is known as a "two-step interrogation" (or "two-stage interview" or "question-first procedure"), in which officers first elicit a custodial statement without providing Miranda warnings and then, after providing the warnings, elicit a second statement. In this case, as detailed above, Detective Singleton initially elicited a statement from Charleston about his involvement in the Stanton murder and then, after obtaining this initial statement, read Charleston his Miranda rights and obtained a formal statement, which the detective transcribed and which was introduced at trial. In cases involving two-step interrogations, generally the initial, pre-warning statement is clearly inadmissible. Here, as noted above, there was no attempt to introduce Charleston's initial statement at trial. But often a contested issue in such cases, as here, is whether the second, post-warning statement is admissible. As the Magistrate Judge observed, an overview of the relevant United States Supreme Court case law on this issue is helpful in order to understand the parties' arguments concerning what constitutes "clearly established Federal law" in this area.
Two-step interrogations were first specifically addressed by the Supreme Court *622 in the case of Oregon v. Elstad, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), in which an officer inadvertently elicited a custodial statement prior to administering Miranda warnings and then, after providing the warnings, obtained a more complete statement. Reversing the state court's determination that the second statement must be suppressed, the Supreme Court held that "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion" with respect to the second statement. Id.at 314, 105 S.Ct. 1285. Rather, "[t]he relevant inquiry is whether, in fact, the second statement was also voluntarily made" and, "[a]s in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements." Id.at 318, 105 S.Ct. 1285. The Court held that "[a] subsequent administration of Miranda warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." Id.at 314, 105 S.Ct. 1285.
Nearly twenty years later, in Missouri v. Seibert, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), the Supreme Court again confronted a two-step interrogation, but under a very different set of facts. Whereas the initial interrogation in Elstad had been brief and inadvertent, the technique used in Seibert revealed a police strategy that was, by the officers' own admission, "adapted to undermine the Miranda warnings" and included pre-warning questioning that was "systematic, exhaustive, and managed with psychological skill." See id.at 616, 124 S.Ct. 2601 (2004) (plurality). Although a majority of the Court determined that the suspect's post-warning statements in Seibert must be suppressed, the Justices were unable to agree on a majority opinion. Rather, the result in Seibert included a plurality opinion authored by Justice Souter, in which three other Justices joined; a concurrence by Justice Breyer, who joined the plurality opinion but wrote separately to articulate his own test; and an opinion by Justice Kennedy concurring in the judgment only. The four remaining Justices dissented.
Justice Souter's plurality opinion in Seibert concluded that the admissibility of statements made after a two-step interrogation depends on "whether Miranda warnings delivered midstream could be effective enough to accomplish their object," based on an objective inquiry from the perspective of the suspect, in which the following five factors should be considered:
[1] the completeness and detail of the questions and answers in the first round of interrogation, [2] the overlapping content of the two statements, [3] the timing and setting of the first and the second, [4] the continuity of police personnel, and [5] the degree to which the interrogator's questions treated the second round as continuous with the first.
Id.at 615, 124 S.Ct. 2601 (plurality). The plurality opinion noted that "[b]ecause the intent of the officer will rarely be as candidly admitted as it was here...the focus is on facts apart from intent that show the question-first tactic at work." Id.at 617 n.6, 124 S.Ct. 2601.[9]
*623 Justice Kennedy, concurring only in the judgment, wrote that he agreed with the plurality's decision that Seibert's statements must be suppressed and he "agree[d] with much in the careful and convincing opinion for the plurality," but he wrote separately to set forth his own approach, which differed from the plurality's approach "in some respects." Id.at 618, 124 S.Ct. 2601 (Kennedy, J., concurring). Justice Kennedy explained that he believed that the plurality's test, which "envisions an objective inquiry from the perspective of the suspect, and applies in the case of both intentional and unintentional two-stage interrogations,...cuts too broadly." Id.at 621-22, 124 S.Ct. 2601. In particular, Justice Kennedy believed that applying "a multifactor test...to every two-stage interrogation" could undermine the clarity of Miranda. Id.at 622, 124 S.Ct. 2601. Instead, Justice Kennedy wrote that he "would apply a narrower test applicable only in the infrequent case...in which the two-step interrogation technique was used in a calculated way to undermine the Miranda warning." Id. In other words, under Justice Kennedy's approach, the court begins by asking whether a "deliberate two-step strategy has been used." Id. If so, then "postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made." Id.[10] If, however, a deliberate two-step strategy was not employed, then the court should apply the test previously articulated by the Supreme Court in Elstad, and the question simply would be whether the subsequent statement was voluntary. In sum, for Justice Kennedy, "[w]hen an interrogator uses [a] deliberate, two-step strategy, predicated upon violating Miranda during an extended interview, postwarning statements that are related to the substance of prewarning statements must be excluded absent specific, curative steps." Id.at 621, 124 S.Ct. 2601.
Finally, Justice O'Connor, writing for the four dissenters, rejected the plurality's approach because she believed it gave "insufficient deference to Elstad," but she also disagreed with Justice Kennedy's approach, believing that it placed improper weight on the subjective intent of the officer. Id.at 622-29, 124 S.Ct. 2601 (O'Connor, J., dissenting).
Following the Supreme Court's decision in Seibert, a clear majority of Circuit courts have held that Justice Kennedy's concurrence is the controlling opinion in the case. This majority includes the Third Circuit, which held in United States v. Naranjo, 426 F.3d 221 (3d Cir. 2005), that "Justice Kennedy's opinion provides the narrowest rationale for resolving the issues raised by two-step interrogations where Miranda warnings are not administered until after police obtain an inculpatory statement." Id.at 231-32. But in view of the divided nature of the Seibert decision, a small minority of Circuit courts have indicated that the Seibert case lacks a clear holding. See Reyes v. Lewis, 833 F.3d 1001, 1002 (9th Cir. 2016) (collecting cases).
*624 iv. The Pennsylvania Superior Court's decision, Charleston's Petition, and the Magistrate Judge's Report and Recommendation
In upholding the denial of Charleston's pretrial motion to suppress, the Pennsylvania Superior Court closely examined the United States Supreme Court's decisions in Elstad and Seibert. Specifically rejecting the Third Circuit's holding in Naranjo and similar cases from other Circuits, the Superior Court concluded that "Seibert establishes no new binding precedent." Charleston, 16 A.3d at 525. In this respect, the court stated that it was persuaded by a dissenting opinion authored by the Honorable Marsha S. Berzon of the Ninth Circuit, who reasoned that "while Justice Kennedy's was the crucial fifth vote for the result...Justice Kennedy's opinion is notthe narrowest opinion embodying a position supported by at least five Justices in the majority" because his intent-based approach was "squarely rejected by seven Justices," i.e., the four dissenters as well as three of the four Justices who joined the plurality opinion. Id.at 525 (quoting United States v. Rodriguez-Preciado, 399 F.3d 1118, 1138-40 (9th Cir. 2005) (Berzon, J., dissenting) ).[11] The Superior Court concluded that because Seibert did not establish new precedent, the court was required to apply the standard set forth in the Supreme Court's earlier Elstadcase. Id.
Applying that standard, the Superior Court focused on whether Charleston's post-warning statement was knowing and voluntary. The court reviewed Detective Singleton's testimony that he read Charleston his rights, that Charleston was "immediately receptive" and was "very cooperative and eager to give his portion of the story," and that Charleston was given something to eat and drink during the interrogation. Id.at 526. "Under these circumstances," the court had "no difficulty concluding that [Charleston's] waiver of his rights and the subsequent statement were both knowing and voluntary." Id.
Charleston contends that the Superior Court's decision was contrary to clearly established federal law. That is, he contends that Justice Kennedy's concurrence in Seibert is clearly established federal law and that, under that standard, he was entitled to the suppression of his statement. In particular, he contends that the "sequence of interrogation demonstrates that the detectives deliberately withheld Miranda warnings until after obtaining a confession"; in other words, "the initial violation of Miranda was not merely hapless or inadvertent but was clearly the result of an intentional withholding designed to prevent [him] from invoking his rights in order to obtain a confession." Pet'r's Mem. Supp. 3, 5, ECF No. 9.
Respondents contend that, despite the Third Circuit's holding in Naranjo, Justice Kennedy's opinion is not clearly established federal law in light of the diversity of approaches that other federal Circuit courts (and state courts) have taken to Seibert. Further, Respondents contend that even if Justice Kennedy's concurrence were clearly established federal law, Charleston would not be entitled to relief, because there is no evidence that Detective Singleton deliberately withheld the Miranda warnings prior to Charleston's initial statement. Finally, Respondents contend that even if the state court's ruling was contrary to clearly established federal law, Charleston cannot show that the admission of his statement "had substantial and injurious effect or influence in determining the jury's verdict," under the standard *625 set forth by the United States Supreme Court in Brecht v. Abrahamson, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).[12]
The Magistrate Judge reviewed the relevant case law in this area, including the Third Circuit's decision in Naranjo, and ultimately concluded that the Court need not decide whether Justice Kennedy's concurrence is clearly established federal law. Rather, the Magistrate Judge agreed with Respondents that, even under Justice Kennedy's approach, Charleston's statement would be admissible because "there is no evidence in the record that Detective Singleton's failure to Mirandize Charleston was purposeful or part of a two-stage technique as in Seibert." R & R 23. The Magistrate Judge proceeded to review the Superior Court's analysis under Elstad and concluded that the Superior Court's decision was neither contrary to nor an unreasonable application of Elstad, nor did it result in an unreasonable determination of the facts.[13]
Objecting to the Magistrate Judge's analysis, Charleston contends that "[t]he absence in the record of any specific reason for the omission of Miranda warnings prior to the first stage of interrogation should be held against the Respondent, not the Petitioner, as the Magistrate Judge has apparently concluded." Pet'r's Statement of Objections 11, ECF No. 24 (hereinafter "Pet'r's Objections"). He argues that there "should be no presumption that the failure to provide warnings was not deliberate, especially in a case where the detective conducts a second interview with full warnings." Id.at 11-12.
v. De novo review
At the outset, this Court acknowledges that the question of whether Justice Kennedy's concurrence is "clearly established Federal law" for the purposes of habeas corpus review is not easy to resolve. As mentioned above, a clear majority of the Circuit Courts-including the Third Circuit-have held that Justice Kennedy's concurrence constitutes the holding in Seibert. Dissenting from this majority, however, one Circuit court has held that Seibert lacks a clear holding, see United States v. Ray, 803 F.3d 244, 272 (6th Cir. 2015) ("[W]e conclude that Seibert did not announce a binding rule of law with respect to the admissibility standard for statements given subsequent to midstream Miranda warnings."), and a number of other Circuit courts have found the matter to be uncertain, see United States v. Widi, 684 F.3d 216, 221 (1st Cir. 2012) ("[H]ow to read the split decision in Seibert may be an open question.");[14] United States v. Heron, 564 F.3d 879, 885 (7th Cir. 2009) ("In the *626 case of Seibert, the only thing we know for sure is that at least seven members of the Court rejected an intent-based approach and accepted some kind of exception to Elstad, even if the scope of that exception remains unclear.");[15] United States v. Carrizales-Toledo, 454 F.3d 1142, 1151 (10th Cir. 2006) ("[A]rguably Justice Kennedy's proposed holding in his concurrence was rejected by a majority of the Court.").
4 Disagreement among the Circuits on a given issue "may be indicative of a lack of clarity in the Supreme Court's jurisprudence." See Hall v. Zenk, 692 F.3d 793, 799 (7th Cir. 2012). But such disagreement does not necessarily mean that there is an absence of clearly established federal law on that issue. See Dennis v. Secretary, Pennsylvania Department of Corrections, 834 F.3d 263 (3d Cir. 2016) (en banc) (holding that it was clearly established federal law that inadmissible evidence could be the basis for a Brady[16] violation, despite the fact that a minority of Circuit courts had held that only admissible evidence could be the basis for such a violation);[17] see alsoWilliams v. Bitner, 455 F.3d 186, 193 (3d Cir. 2006) (stating, in the context of a qualified immunity analysis, that "[e]ven if our sister circuits had in fact split on the issue, we would not necessarily be prevented from finding that the right was clearly established"); but seeGarrus v. Sec'y of Pennsylvania Dep't of Corr., 694 F.3d 394, 416 (3d Cir. 2012) (Hardiman, J., dissenting) ("The existence of a circuit split demonstrates that it is wrong to conclude that fairminded jurists could not disagree on the correctness of the state court's decision in this case." (internal quotation marks and alterations omitted) ); see generallyRuth A. Moyer, Disagreement About Disagreement: The Effect of A Circuit Split or "Other Circuit" Authority on the Availability of Federal Habeas Relief for State Convicts, 82 U. Cin. L. Rev. 831, 847 (2014). Ultimately, however, the Court agrees with the Magistrate Judge that it need not resolve the question of whether Justice Kennedy's concurrence is "clearly established Federal law" because, even under Justice Kennedy's standard, Charleston's formal statement was admissible.
56 As set forth above, the threshold question in Justice Kennedy's test is whether a "deliberate two-step strategy has been used" or, in other words, if "the two-step interrogation technique was used in a calculated way to undermine the Miranda warning."[18] In applying Justice *627 Kennedy's test, courts have "review[ed] the totality of the objective and subjective evidence surrounding the interrogations in order to determine deliberateness." United States v. Capers, 627 F.3d 470, 479 (2d Cir. 2010) ; see United States v. Shaird, 463 Fed.Appx. 121, 124 (3d Cir. 2012) (considering "the surrounding circumstances and [the officer's] testimony of his own actions and motivation" to determine deliberateness).[19] Where credible subjective evidence of the officer's intent is available, it will "of course be persuasive, and often decisive." See United States v. Moore, 670 F.3d 222, 230 n.3 (2d Cir. 2012) ; Shaird, 463 Fed.Appx. at 124 ("Critically, [the officer] testified that his [pre-warning] conversation with the [defendant] was a deliberate strategy to elicit a confession"). But because such evidence often will be unavailable, "in most instances, the inquiry will rely heavily, if not entirely, upon objective evidence." Capers, 627 F.3d at 479 (2d Cir. 2010). In seeking guidelines for how to assess "objective evidence" in this context, courts have turned to the five factors articulated by the Seibert plurality, namely:
[1] the completeness and detail of the questions and answers in the first round of interrogation[;]
[2] the overlapping content of the two statements[;]
[3] the timing and setting of the first and the second [interrogations;]
[4] the continuity of police personnel[;] and
[5] the degree to which the interrogator's questions treated the second round as continuous with the first.
Seibert, 542 U.S. at 615, 124 S.Ct. 2601 (plurality). Although these factors "were developed by the [Seibert ] plurality to gauge whether the later Miranda warnings 'could be effective enough to accomplish their object,' " courts have found that they "likewise will often serve as helpful indicia for whether an alleged two-step interrogation was intended to circumvent Miranda." See Moore, 670 F.3d at 230.[20]
A review of the evidence in this case leads the Court to conclude that Respondents have shown by a preponderance of the evidence that the detectives did not engage in a deliberate two-step strategy to deprive Charleston of his Miranda rights. The Court begins by observing that the record lacks any subjective evidence of Detective Singleton's intent. As set forth above, Detective Singleton testified that, prior to administering the Miranda warnings, he asked Charleston "about the circumstances surrounding the murder of William Stanton," in response to which Charleston "explained in some detail what occurred in the house," and that "at some point" thereafter the detective provided the Miranda warnings to Charleston. But Detective Singleton did not testify as to *628 whyhe did not provide the Miranda warnings before asking Charleston about the circumstances of Stanton's murder, nor did he testify as to why he chose to administer the warnings when he did.
Turning to the objective evidence, the first Seibert factor considers the "completeness and detail of the questions and answers in the first round of interrogation." In particular, courts have found that where the pre-warning questioning is "systematic, exhaustive, and managed with psychological skill," as in Seibert, it is more likely that the omission of the Miranda warnings was deliberate. See United States v. Aguilar, 384 F.3d 520, 525 (8th Cir. 2004) (concluding that, under Seibert, "the Miranda warnings between the two questioning sessions did not serve the purpose of the dictates in Miranda," where, inter alia, "the first questioning session consisted of more than routine booking questions, included some good cop/bad cop questioning tactics, and lasted approximately ninety minutes"). Conversely, when an interrogation is brief, it is more likely that the omission of Miranda warning was not deliberate. See United States v. Williams, 681 F.3d 35, 44 (2d Cir. 2012) (determining that omission of Miranda warnings was not deliberate when, among other factors, the initial questioning was "brief and spare"); United States v. Materas, 483 F.3d 27, 33 (1st Cir. 2007) (determining that omission of Miranda warnings was not deliberate where, among other factors, "the first questioning was not at all systematic or extensive" (internal quotation marks omitted) ); United States v. Street, 472 F.3d 1298, 1314 (11th Cir. 2006) (determining that the omission was not deliberate where, among other factors, the pre-warning questioning was "brief and general"); but see United States v. Young, No. 15-50158, 720 Fed.Appx. 846, 848-49, 2017 WL 6603511, at *2 (9th Cir. Dec. 27, 2017) (finding detectives deliberately engaged in a two-step interrogation where, among other things, they interrogated the defendant "at the police station for at least twenty minutes without providing any Miranda warnings"). Similarly, where the pre-warning questioning is non-confrontational, it is more likely that the omission of Miranda warnings was not deliberate. See United States v. Nunez-Sanchez, 478 F.3d 663, 668-69 (5th Cir. 2007) (determining that there was "no evidence of a deliberate attempt to employ a two-step strategy" when "[a]ll evidence suggests that [the suspect] was calm and cooperative, and the agents did not act with aggressiveness or hostility" during brief pre-warning questioning).
Here, Detective Singleton testified that he administered the Miranda warnings about twenty minutes after he entered the interview room that morning. Within that twenty-minute period, Detective Singleton gave Charleston water and a cheese sandwich, asked Charleston a series of biographical questions, and then asked Charleston about his involvement in the shooting. Moreover, within this brief span of time, there is no evidence that Detective Singleton's questioning of Charleston was in any respect systematic or "managed with psychological skill." Rather, according to Detective Singleton's testimony, he simply "asked [Charleston] about the circumstances surrounding the murder of William Stanton," and Charleston, in response, "seemed eager to tell his portion of the story" and "explained in some detail what happened in the house." Likewise, as indicated above, the trial judge found that there was no evidence of coercion before or during the questioning. The brief and non-confrontational pre-warning questioning in this case, then, is in sharp contrast with the intensive and extended pre-warning interview in Seibert, a factor that weighs in favor of finding that Detective Singleton's omission of the Miranda warnings was not deliberate.
*629 The fifth Seibert factor-concerning the degree to which the interrogator's questions treated the second round as continuous with the first-also weighs in favor of a finding of non-deliberateness in this case. In Seibert, as Justice Kennedy observed, the officer's intent to subvert Miranda was evidenced by the fact that the post-warning questioning "resembled a cross-examination" in which the officer "confronted the defendant with her inadmissible prewarning statements and pushed her to acknowledge them." See Seibert, 542 U.S. at 621, 124 S.Ct. 2601 (Kennedy, J., concurring); United States v. Gonzalez-Lauzan, 437 F.3d 1128, 1136 (11th Cir. 2006) ("Thus the type of two-step questioning that falls within Justice Kennedy's narrow concurrence is the type used in Seibert, where officers in a calculated manner first obtained unwarned incriminating statements from a suspect, and then used those incriminating statements in the warned interrogationin order to undermine the midstream Miranda warnings." (emphasis added) ). Here, by contrast, Detective Singleton's post-warning questions were open-ended in nature; the detective did not pressure Charleston to conform his answers to his earlier statement, nor did the detective even refer back to that statement.
In addition to the first and fifth Seibert factors, there are other considerations weighing in favor of a finding of non-deliberateness in this case. As Respondents point out, Detective Singleton had declined to interview Charleston the previous night because he believed Charleston was not sober. Arguably, if Detective Singleton had been intent on subverting Miranda, he would have seized the opportunity to question Charleston when his judgment was possibly impaired. Further, as detailed above, on the night Charleston was taken into custody he told Officer Soliman that he knew nothing about the Stanton killing. Although the record does not reflect whether Detective Singleton and Officer Soliman discussed Charleston's answer, it is a fair assumption that they had done so, given that they worked together on the evening that Charleston was brought to the station. Accordingly, Detective Singleton might well have expected that Charleston, in response to a neutrally-worded question about "the circumstances surrounding the murder of William Stanton," would continue to claim that he knew nothing about the incident.
On the other hand, several of the Seibert factors weigh in the opposite direction. In particular, under the third and fourth Seibert factors, the two interrogations occurred at the same place and time and the same police personnel were present at each interrogation, considerations that weigh in favor of a finding of deliberateness.[21] On balance, however, the Court finds that there is a preponderance of evidence that Detective Singleton's initial omission of Miranda warnings was not a deliberate attempt to subvert Miranda. Particularly in view of the brief and non-confrontational nature of the initial questioning and the open-ended and similarly non-confrontational nature of the second questioning, the Court finds the detective's initial failure to read Charleston his Miranda rights, "though unfortunate and unexplained, seems much more likely to *630 have been a simple failure to administer the warnings rather than an intentional withholding that was part of a larger, nefarious plot." See Reinert v. Larkins, 379 F.3d 76, 91 (3d Cir. 2004). Accordingly, the two-step interrogation in this case does not present the Court with "the infrequent case...in which the two-step interrogation technique was used in a calculated way to undermine the Miranda warning."[22]
789 Finally, the Court finds that even if Charleston's statement was erroneously admitted, the admission did not have "[a] substantial and injurious effect or influence in determining the jury's verdict," under the standard set for by Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). Under this test, the court may grant relief only if it has a "grave doubt" as to whether the error at trial had a substantial and injurious effect or influence. See Johnson v. Lamas, 850 F.3d 119, 133 (3d Cir. 2017). In other words, "[t]here must be more than a 'reasonable probability' that the error was harmful." Id. (quoting Davis v. Ayala, --- U.S. ----, 135 S.Ct. 2187, 2198, 192 L.Ed.2d 323 (2015) ). The court's role is to ask whether the constitutional error "substantially influenced the jury's decision." See Adamson v. Cathel, 633 F.3d 248, 259-60 (3d Cir. 2011) (quoting O'Neal v. McAninch, 513 U.S. 432, 436, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995) ). "If, when all is said and done, the [court's] conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand."Id. (quoting O'Neal,513 U.S. at 437, 115 S.Ct. 992 ). "The Supreme Court has cautioned that 'the uncertain judge should treat the error, not as if it were harmless, but as if it affected the verdict.' " Id. (quoting O'Neal, 513 U.S. at 435, 115 S.Ct. 992 ).
As indicated above, Respondents contend that the admission of Charleston's statement did not cause Brecht prejudice in this case. This is because, in their view, Charleston's statement was not a "confession" but rather was a "substantially exculpatory explanation of events," Charleston "freely admitted at trial that he shot the victim (or at least that the gun discharged while he struggled for control of it)," and the evidence that Charleston murdered Stanton "would have been overwhelming even in the absence of his statement to police and testimony." Resp. 28-29, ECF No. 18.
Charleston, on the other hand, contends that the admission of the statement did cause Brecht prejudice in view of the fact that the statement was read to the jury, and that the prosecutor, in her closing argument, "argued that [Charleston] had drastically changed his story" at trial:
The prosecutor pointed out that in the Petitioner's statement to the police, he had told Detective Singleton that both of the parties had their hands on the firearm while all three shots were fired; however, after hearing the ballistician testify that the firearm would have jammed in that scenario, the Petitioner testified *631 at the trial that his hand was on the victim's arm and not on the firearm. Additionally, the prosecutor argued that in the police interview, the Petitioner had said that he had told his mother about self-defense, yet at trial, the Petitioner testified that he had not so informed his mother.
Pet'r's Objections 12.
The Court finds that, in light of the evidence presented at trial, the admission of Charleston's statement did not have a substantial and injurious effect or influence in determining the jury's verdict under Brecht. Charleston is correct that the prosecutor, in her closing argument, pointed out several inconsistencies between Charleston's statement and his trial testimony. But this was by no means the focus of the prosecutor's argument, nor was this the only evidence that served to undermine Charleston's credibility. Rather, there was a wide range of evidence pointing to Charleston's guilt and undermining his credibility.
Above all, the prosecutor showed that the account of the shooting that Charleston presented in his testimony at trial[23] was not believable in light of common sense and the other evidence presented at trial. As in his statement to Detective Singleton, Charleston testified at trial that on the day of the shooting, after he and Stanton had entered the home at 2428 North 25th Street to conduct a purchase of Xanax pills, they got into an argument about the pills and Stanton pulled out a gun, which Charleston attempted to wrestle away from him. See Trial N.T., Aug. 24, at 33-41, 52-110. Charleston testified that during the struggle over the gun, his hands were on Stanton's wrists and forearm. Id.at 48, 101-110. (As indicated above, this differed from his statement, where he indicated that both of their hands were on the gun.) Charleston further testified that the gun fired several times and Stanton fell to the ground, facedown. Id.at 42-43, 109-119. As Stanton was lying on his stomach, Charleston asked Stanton if he was ok, but Stanton did not respond, and Charleston was not sure if Stanton had been shot. Id.at 112-118. After Stanton failed to respond to him, Charleston took the gun out of Stanton's hand, exited the home with the gun concealed under his shirt, and then threw the gun into a sewer. Id.at 44, 120-124. He testified that he threw the gun in a sewer because he was concerned that one of the neighborhood children might come across it if he left it in the house. Id.at 122-123.
As the prosecutor contended in her closing argument, common sense and the evidence presented at trial contradicted every aspect of this story. First, with respect to the shooting itself, forensic evidence showed that Stanton had been shot three times, in the chest, lower abdomen, and right thigh, and that the gunshot to his chest was fired from two to six inches away and traveled horizontally straight through Stanton's heart and lungs. See *632 N.T., Aug. 21, at 62-114. The evidence also showed that the gun from which the shots were fired requires that the trigger must be pulled for each shot fired, with a force of six to seven pounds. Trial N.T., Aug. 21, at 124-30. Given these facts, it is nearly impossible to imagine that the shooting occurred as Charleston testified that it did. That is, it is not credible that Charleston, who was smaller than Stanton, controlled Stanton's forearm and wrist in such a way that he caused Stanton to shoot himself three times-including one shot straight through the chest, from two to six inches away-applying six to seven pounds of pressure on the trigger each time. In short, as the prosecutor argued, Charleston's testimony that Stanton "shoots himself and then continues to shoot himself" does not make sense. See Trial N.T., Aug. 24, at 176.
Charleston's testimony concerning his conduct after the shooting is similarly incredible. As the prosecutor emphasized in her closing argument, the notion that Charleston did not realize that Stanton had been shot when, by Charleston's own account, Stanton was lying on the ground in an unresponsive state, is not believable. Moreover, according to Charleston's testimony, Stanton was his friend. But, as the prosecutor pointed out, after the shooting, Charleston made no effort to call 911 or otherwise seek help. Likewise, Charleston's account of his decision to dispose of the gun also makes little sense when, if Charleston's testimony about the circumstances of the shooting were true, the gun would have had only Stanton's fingerprints on it, which would have been powerful evidence in support of Charleston's account. Finally, the jury heard evidence that Stanton's body was found with only a set of keys, a cell phone, and $3 on his person. See Trial N.T., Aug. 20, at 96. But according to Stanton's mother, Stanton had over $500 on him earlier in the day, and Charleston testified that Stanton had Xanax pills. As the prosecutor argued, the fact that Stanton was found without the money and pills supports the prosecution's theory that Charleston robbed Stanton.
The jury also heard testimony that, in the hours after the shooting, Charleston denied to several persons that he had been at 2428 North 25th Street or that he knew what had happened to Stanton. See Trial N.T., Aug. 19, at 88-89, 168-70.[24] In particular, Stanton's mother testified that on the afternoon of the shooting, after trying unsuccessfully to reach her son by phone, she saw Charleston walk by her house, coming from the direction of 2428 North 25th Street. Trial N.T., Aug. 21, at 48-61. She asked Charleston if he had seen her son, as the two were good friends and she considered Charleston to be like a son to her. Id.at 48-52, 60-61. Charleston replied "no" and kept walking. Id.at 48-52.
In short, even in the absence of Charleston's statement, there was overwhelming evidence of Charleston's guilt and lack of credibility, and the prosecutor drew upon all of this evidence in making her closing argument. In particular, the prosecutor closely examined the account of the shooting that Charleston presented in his testimony and showed that even if one takes that account on its own terms-setting aside its contradictions with Charleston's statement-it is not believable. Accordingly, the Court finds that the admission of Charleston's statement did not have a substantial and injurious effect or influence in determining the jury's verdict under Brecht. Even without Charleston's statement, *633 there was overwhelming evidence that Charleston murdered Stanton. Charleston's first objection is overruled.
B. Objection Two, concerning the admission of tattoo evidence, is overruled.
10 Charleston's second objection concerns his claim that his due process rights were violated by the admission of evidence that he had a tattoo of the words "By any means necessary, f--- it, s--- happens." He contends that the admission of this evidence deprived him of a fundamentally fair trial because the prosecutor used this evidence to improperly launch an attack on his character.[25]
The Magistrate Judge determined that Charleston procedurally defaulted on this claim because he failed to present this claim to the state courts. Rather, at the state level, Charleston challenged the admission of the tattoo evidence as being an error only in state evidentiary rulings, not a federal due process violation. The Magistrate Judge acknowledged that Charleston's brief in support of his direct appeal at the state level cited a federal case, namely, Boliek v. Delo, 912 F.Supp. 1199 (W.D. Mo. 1995), but the Magistrate Judge determined that Charleston's citation to Boliek, by itself, did not serve to notify the state courts that he was challenging the admission of the tattoo evidence on due process grounds. This is because the relevant finding in Boliek was that counsel's failure to object to the admission of irrelevant tattoo evidence violated the defendant's right to effective assistance of counsel, not that the admission of such evidence violated the defendant's due process rights.[26]
Charleston objects that the Boliek opinion "went beyond the question of effective assistance of counsel in order to determine whether or not the underlying claim of the [defendant's] had arguable merit." Pet'r's Objections 17. But the Boliek opinion was clear that the issue on which it was ruling was the ineffectiveness of counsel: "This Court finds that trial counsel was ineffective. His performance and the prejudice petitioner suffered as a result of his performance undermine this Court's confidence in the outcome of the trial and of the penalty phase." Boliek, 912 F.Supp. at 1214. The Boliek court made no determination as to whether admission of the tattoo evidence violated the defendant's due process rights. Accordingly, Charleston's citation to Boliek alone did not alert the state court that he was challenging the tattoo evidence on due process grounds, and Charleston's objection on this point is overruled.[27]
C. Objections Three through Five, concerning the ineffective assistance of counsel, are overruled.
Charleston's final three objections concern claims of ineffective assistance of counsel.
*634 i. Objection Three, concerning counsel's failure to object to the trial court's limiting instruction for Clara Stanton's testimony, is overruled in part.
Charleston's first ineffectiveness of counsel objection concerns trial counsel's failure to object to a limiting instruction the trial court gave concerning the testimony of Clara Stanton, the mother of the victim.
During the trial, the prosecution called to the stand a witness named Nashua Sanders, a friend of Charleston and an acquaintance of the victim and the victim's mother, Clara Stanton. The prosecutor asked Ms. Sanders whether she had told Ms. Stanton that she (Sanders) had a conversation with Charleston in which Charleston stated that he planned to rob the victim. Trial N.T., Aug. 20, at 36. Sanders denied that she said this to Ms. Stanton, and she also denied that Charleston had ever told her such a thing. Id.
Following Nashua Sanders's testimony, the prosecutor called Ms. Stanton as a witness. When the prosecutor began to ask Ms. Stanton about whether she had a conversation with Nashua Sanders about what had happened to her son, defense counsel objected and a sidebar discussion was held concerning whether Ms. Stanton could testify about what Ms. Sanders had purportedly said to her. Id.at 63. The trial judge deferred issuing a definitive ruling on the matter and later that same afternoon heard further argument from the parties. The prosecutor argued that Ms. Stanton's testimony would be admissible under Pennsylvania Rule of Evidence 613(b), which permits the admission of extrinsic evidence of a witness's prior inconsistent statement under certain circumstances. See id.at 103. The prosecutor argued that this testimony was "classic impeachment," i.e., she would be impeaching Nashua Sanders by providing evidence of a prior inconsistent statement that she made to Ms. Sanders. Id.at 105. The trial court ruled that the testimony was admissible as extrinsic evidence of a prior inconsistent statement, but advised the attorneys that because the statement was hearsay, he would "give a limiting instruction because just [sic] the statement was said does not mean it's true." Id.at 108. The prosecutor then stated that she was not "asking for it to come in substantively. It's for impeachment purposes," id.at 108, to which the trial court responded, "I'll allow it under that limited circumstances and I'll give a limited instruction." Id.at 109. Defense counsel stated, "Yes, your Honor." Id.
Ms. Stanton was then recalled to the stand, where she testified that about three weeks after her son's death, Ms. Sanders told her about a conversation that she (Sanders) had with Charleston about a week before the shooting, in which Charleston said that he planned to rob the victim. Id.at 111-12. Following Ms. Stanton's testimony, the trial court gave the following limiting instruction:
Ladies and gentlemen, with regard to the testimony that you just heard, I'm just going to give you an instruction and that evidence is not necessarily to be accepted for the truth of the statements made by Ms. Sanders to Ms. Stanton, okay. It doesn't-they were statements and you will be given additional instructions at the appropriate time.
Id.at 116. There were no objections made to this instruction. No further instruction regarding this testimony was included in the closing instructions.
The parties agree that Ms. Stanton's testimony was admissible solely for the purpose of impeaching Ms. Sanders under Pennsylvania Rule of Evidence 613. Charleston contends that the trial court's instruction that Ms. Stanton's statements were "not necessarily" to be accepted for *635 the truth of the matter asserted was erroneous and prejudicial, and that trial counsel's failure to request a proper instruction deprived him of the effective assistance of counsel.
In its review of Charleston's appeal under Pennsylvania's Post-Conviction Relief Act (PCRA), the Superior Court determined that Charleston had waived this claim for two reasons. See Com. v. Charleston, 94 A.3d 1012, 1021 (Pa. Super. Ct. 2014). First, the Superior Court determined that Charleston had failed to adequately develop an argument under Commonwealth v. Pierce, 515 Pa. 153, 527 A.2d 973 (1987), which requires that, in order to prove counsel ineffective, the petitioner must show that: (1) his underlying claim is of arguable merit; (2) counsel had no reasonable basis for his action or inaction; and (3) the petitioner suffered actual prejudice as a result. The Superior Court determined that Charleston's briefing (1) "fail[ed] to develop an argument or present pertinentauthority that the court's use of the colloquial expression 'not necessarily' rendered its instruction fatally equivocal"; (2) "fail[ed] to develop an argument that counsel had no reasonable basis not to request an additional instruction,"; and (3) failed to develop an argument that there exists a "a reasonable probability that, but for counsel's alleged unprofessional error in not requesting a second instruction, the result of the proceedings would have been different." Charleston, 94 A.3d at 1021. Second, the Superior Court indicated that Charleston waived this claim under Pennsylvania Rule of Appellate Procedure 2119(a).[28] This is because Charleston "merely assume[d] that the statement at issue was introduced by the Commonwealth as substantive evidence of [his] intent to commit 'murder and robbery,' rather than as evidence of an inconsistent statement" and because he merely "relie[d] on a lengthy quotation from the prosecutor's closing argument" in support of this claim. Id.at 1022.
In addition to its waiver analysis, the Superior Court also determined that Charleston's "challenge to the jury instruction which the trial court actually gave does not have merit," in view of the broad discretion that trial courts have in phrasing their instructions under Pennsylvania law. Id.at 1021. Moreover, the court found that "trial counsel had an obvious reasonable basis not to seek an additional instruction, which would have necessarily reminded the jury of the underlying statement that [Charleston] planned to rob the victim." Id. Accordingly, the court concluded that Charleston's claim "is waived and would not merit relief." Id.
In reviewing this claim as presented in Charleston's habeas corpus Petition, the Magistrate Judge initially considered the question of whether the Court has an independent duty to review the Superior Court's determination that Charleston waived this claim under Pennsylvania law. As the Magistrate Judge observed, several *636 courts in this Circuit have determined that the question of whether a habeas corpus petitioner complied with state appellate rules "is a matter of state law, beyond [the federal court's] review." SeeKlein v. Kelchner, No. CIV.A. 02-8451, 2003 WL 22204561, at *3 (E.D. Pa. Sept. 4, 2003) ; see alsoLeake v. Dillman, 594 Fed.Appx. 756, 759 (3d Cir. 2014) ("[E]ven if the Superior Court incorrectly deemed waived certain of Petitioner's ineffective assistance claims ... habeas relief would not be warranted, as it is 'well established that a state court's misapplication of its own law does not generally raise a constitutional claim.' " (quoting Taylor v. Horn, 504 F.3d 416, 448 (3d Cir. 2007) ) ). Nevertheless, relying on Rolan v. Coleman, 680 F.3d 311 (3d Cir. 2012), the Magistrate Judge determined that the Court has a duty to independently review the Superior Court's analysis of the waiver issue. R & R at 21.[29]
Applying that analysis, the Magistrate Judge reached the same conclusion as the Superior Court, namely that Charleston waived this claim by failing to adequately develop his Pierce argument in his state court briefing. Specifically, the Magistrate Judge determined that Charleston failed to adequately present an argument that he had suffered actual prejudice, as his sole argument on this point in his state court briefing was that "[s]ince intent was the key issue for the jury to resolve, he was surely prejudiced." R & R at 53 (quoting Appellant's Brief at 12-13). Because Charleston "offered no argument or pertinent caselaw to establish that the admission of such hearsay evidence regarding motive could result in a different result," the Magistrate Judge concluded that he failed to substantially comply with Pennsylvania's appellate rules. R & R at 35-36.[30]
Charleston objects that his PCRA briefing did, in fact, fairly present his argument on this issue. In particular, he directs this Court's attention to the dissenting opinion of the Honorable Judith Olson of the Superior Court, who disagreed with the conclusion of Superior Court majority's opinion that Charleston had waived this issue.
1112 Reviewing this issue de novo, first, with respect to the waiver issue, the Court agrees with the Magistrate Judge that, in light of the Third Circuit's opinion in Rolan, the Court has a responsibility to independently review the Superior Court's determination that Charleston waived this claim. Having reviewed Charleston's PCRA briefing, the Court finds that although Charleston's argument on this issue was somewhat lacking in legal citations and analysis, his argument was sufficiently clear to avoid waiver of the claim. As *637 Judge Olson observed, Charleston's brief "devoted over 1600 words, filling six and one-half pages, of his argument section to addressing this single issue," providing thirteen citations to trial testimony and four case citations. Charleston, 94 A.3d at 1029 (Olson, J., concurring and dissenting). In particular, with respect to the prejudice element of his claim, Charleston's argument that "intent was the key issue to resolve" was sufficiently clear where it was evident that one of the issues in this case was whether (as Charleston testified) the shooting occurred as the result of a struggle over Stanton's gun or whether (as the prosecutor argued) the shooting occurred as the result of Charleston's attempt to obtain Stanton's Xanax and money.
13 Second, with respect to the merits of Charleston's claim, this Court must defer to the Superior Court's determination that Charleston's "challenge to the jury instruction which the trial court actually gave does not have merit" under Pennsylvania law. SeePriester v. Vaughn, 382 F.3d 394, 402 (3d Cir. 2004) (holding that the federal court is "[b]ound by the state court's determination that the instruction at issue comported with state law").
14 Moreover, even if the jury instruction was erroneous,[31] the Court is unable to say that the state court's application of the Strickland[32] standard was unreasonable. SeeGrant v. Lockett, 709 F.3d 224, 232 (3d Cir. 2013) ("When a federal habeas petition under § 2254 is based upon an ineffective assistance of counsel claim, '[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable,' which 'is different from asking whether defense counsel's performance fell below Strickland's standard.' " (quoting Harrington v. Richter, 562 U.S. 86, 88, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011) ) ). The Superior Court's conclusion that trial counsel may have made a calculated decision not to request a revised instruction, in an attempt not to highlight the testimony, is not unreasonable.
Accordingly, the Court defers to the Superior Court's decision that the instruction was not contrary to Pennsylvania law and, in any event, finds that the state court's application of the Strickland standard was not unreasonable.[33] Charleston's objection *638 is therefore overruled in part.
ii. Objection Four, concerning counsel's failure to object to the trial court's statement concerning evidence that Charleston's "reputation for telling the truth is bad," is overruled.
Charleston's second ineffectiveness of counsel objection, and fourth objection overall, concerns his trial counsel's failure to object to the trial court's statement that Charleston's "reputation for telling the truth is bad." On this issue, Charleston's Statement of Objections simply repeats the arguments presented in his earlier Memorandum in Support of his Petition and does not specify which aspects of the R & R's analysis, if any, he objects to.
During the trial, the prosecution read a stipulation to the jury that Charleston had three prior convictions-namely, that he had been found guilty of theft on September 1, 2004, of unauthorized use of an automobile on December 17, 2004, and of theft on July 26, 2005. Trial N.T., Aug. 24, at 146. Then, in the closing instructions, the judge stated the following:
The defendant took the stand as a witness. In considering the defendant's testimony [, y]ou are to follow the general instructions I gave you for judging the credibility of witnesses. You should not disbelieve the defendant's testimony merely because he is the defendant.
There was evidence tending to prove that the defendant has prior criminal convictions. And I'm speaking of the record introduced by the Commonwealth by stipulation. The assistant district attorney introduced evidence tending to show that the defendant's reputation for telling the truth is bad.
This evidence is not evidence of the defendant's guilt. You must not infer guilt from the evidence of prior convictions. This evidence may be considered by you for one purpose only, that is, to help you judge the credibility and weight of the testimony given by the defendant as a witness in this trial.
In considering the evidence of prior convictions, you may consider the types of crimes committed, how long ago they were committed, and how it may affect the likelihood that the defendant has testified truthfully in this case.
Id.at 226-27 (emphasis added).
In his Petition, Charleston contends that the trial judge conflated crimen falsievidence and credibility evidence, and that there was, in fact, no evidence presented at trial that his "reputation for telling the truth is bad." He claims that his counsel's failure to object to the judge's instruction on this point deprived him of the effective assistance of counsel.
1516 Applying the Strickland standard, the Magistrate Judge determined that counsel's failure to object was not objectively unreasonable in the context of the case. As the Magistrate Judge points out, the trial court's reference to Charleston's reputation was "sandwiched between sentences referring to Charleston's prior convictions." R & R at 42. Accordingly, "[r]ather than objecting and having the court focus its attention even further on Charleston's prior convictions, perhaps even repeating that he had two theft convictions and one conviction for unauthorized use of a vehicle, counsel may have strategically chosen to remain silent on the issue." Id.With respect to the prejudice element of Strickland, the Magistrate Judge concluded that "it is unlikely that the jury was well-versed in Pennsylvania evidentiary law or that it appreciated the distinction between Charleston's prior convictions and a reputation for untruthfulness" and, furthermore, "the jury had other reasons to question Charleston's credibility," including the crimen falsievidence *639 and the discrepancies between his version of events and the physical evidence set forth at trial. Id.Accordingly, the Magistrate Judge concluded that Charleston "has failed to establish a reasonable probability that counsel's failure to object to the judge's use of the term reputation during the charge affected the outcome of the trial." Id.
After de novo review of this matter, the Court adopts the R & R's analysis of this issue and the objection is overruled.
iii. Objection Five, concerning counsel's failure to request an involuntary manslaughter instruction, is overruled in part.
In his final objection, Charleston argues that his trial counsel was ineffective when he failed to request a jury instruction for involuntary manslaughter.[34] The Superior Court determined that, like Charleston's claim concerning Ms. Stanton's testimony, this claim was waived because Charleston failed to develop an argument for his claim under the Pierce test. Further, the court determined that Charleston's claim would not merit relief because, among other things, involuntary manslaughter was not "at issue in the trial." Charleston, 94 A.3d at 1026. Moreover, the court's "independent review of the pertinent authority confirm[ed] that there is no arguable merit to [Charleston's] claims" on this issue. Id.at 1027. Accordingly, the Superior Court concluded that "[t]rial counsel's strategic decision not to pursue [the] competing theor[y] of ... involuntary manslaughter with requested instructions had a reasonable basis." Id. Finally, the Superior Court stated that it "discern[ed] no basis to find trial counsel ineffective, based on the information supplied by [Charleston], for pursuing his claim of self-defense and presenting the jury with a consistent theme and strategy of the case." Id.
The Magistrate Judge agreed with the Superior Court that Charleston waived this claim by failing to adequately brief it, concluding that Charleston failed to provide any support in his state court briefing for his contention that trial counsel "could have no reasonable basis" for failing to request this instruction. R & R at 37. Likewise, the Magistrate Judge determined that Charleston's assertion that "the outcome of this trial may well have been different" had counsel requested the instruction was insufficient to support an argument for prejudice under Strickland.[35]
17 Beginning with the waiver issue, although it is true that Charleston's PCRA briefing did not include significant analysis for each aspect of this claim, this Court finds that he sufficiently presented the *640 claim. As Judge Olson observed in her dissent:
[Charleston] allotted over 900 words, approximately four pages, to the portion of his argument addressing counsel's alleged dereliction in failing to seek a jury instruction on involuntary manslaughter and/or homicide by misadventure.... He cited to the notes of testimony six times. He cited approximately ten cases from this Commonwealth addressing relevant legal issues. He discussed how these cases were applicable to the case at bar and why he was entitled to relief.
Charleston, 94 A.3d at 1035 (Olson, J., dissenting and concurring).
1819 With respect to the merits of this claim, the Superior Court's majority opinion determined-despite a dissent from Judge Olson on this point-that an involuntary manslaughter instruction was not appropriate in this case under Pennsylvania law. As Respondents indicate, this Court is "[b]ound by the state court's determination" on this issue of state law. SeePriester, 382 F.3d at 402. Accordingly, the Court must defer to the Superior Court's ruling that Charleston was not entitled to an involuntary manslaughter conviction under Pennsylvania law. Further, the Court finds that the Superior Court reasonably concluded that Charleston's counsel was not ineffective when he presented "a consistent theme and strategy of the case" of self-defense, rather than seek an involuntary manslaughter instruction. As the Superior Court observed, in Charleston's statement to Detective Singleton and in his testimony, Charleston maintained that he acted in self-defense. As the Superior Court reasonably concluded, an involuntary manslaughter charge might have obscured this consistent theme. Charleston's objection is therefore overruled in part.
V. The Court will not issue a certificate of appealability.
20212223 When a district court issues a final order denying a § 2254 petition, the court must also decide whether to issue a certificate of appealability (COA). See3d Cir. L.A.R. 22.2. A certificate of appealability is appropriate when a petitioner makes a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000). By contrast,
when the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.
Id."A prisoner seeking a COA must prove 'something more than the absence of frivolity' or the existence of mere 'good faith' on his or her part." Miller-El v. Cockrell, 537 U.S. 322, 338, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983) ). But the Supreme Court does "not require petitioner to prove, before the issuance of a COA, that some jurists would grant the petition for habeas corpus." Id."Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received *641 full consideration, that petitioner will not prevail." Id.
24 Here, the Court has ruled on the merits of Charleston's first, third, fourth, and fifth claims. The Court denied his second claim on procedural grounds.[36] For the reasons set forth herein and in the R & R, Charleston has not made a substantial showing of the denial of a constitutional right, nor would jurists of reason find the Court's assessment debatable or wrong.[37] The Court therefore finds that a certificate of appealability is not warranted for Charleston's claims.
VI. Conclusion
After de novo review of the habeas corpus petition and supporting briefs, the state court records, the R & R, and Charleston's objections to the R & R, and for the reasons set forth herein, the R & R is adopted in part. The Court adopts the Magistrate Judge's recommendations with respect to Charleston's first, second, and fourth claims in their entirety. With respect to Charleston's third and fifth claims, the Court does not adopt the recommendation that these claims be deemed waived; rather, the Court finds that these claims do not merit relief. Accordingly, the Court adopts the Magistrate Judge's conclusion that Charleston is not entitled to relief on any of his claims and the recommendation that his Petition be denied. The Court also adopts the conclusion that there has been no substantial showing of the denial of a constitutional right requiring the issuance of a certificate of appealability.
For the above stated reasons, Charleston's Petition is denied. A separate order follows.
REPORT AND RECOMMENDATION
October 20, 2016
ELIZABETH T. HEY, U.S.M.J.
BRANDON CHARLESTON
v.
ROBERT D. GILMORE, et al.[1]
*642 This is a counseled petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254, on behalf of Brandon Charleston ("Charleston"), who is currently incarcerated at SCI-Greene. For the reasons that follow, I recommend that the petition be denied.
I. FACTS AND PROCEDURAL HISTORY
On August 25, 2009, following a trial before the Honorable George W. Overton of the Court of Common Pleas of Philadelphia County, a jury convicted Charleston of murder in the first degree and possession of an instrument of crime. N.T. 8/25/09 at 7-8. The charges arose from the June 15, 2008 shooting death of William Stanton inside 2428 North 25th Street in Philadelphia.[2] On September 23, 2009, Judge Overton sentenced Charleston to life imprisonment for murder and a concurrent term of 3 -to- 24 months' imprisonment for the weapons offense. Commonwealth v. Charleston, CP-51-CR-0010713-2008, Docket Sheet (Phila C.C.P.) ("Docket Sheet"); see also Commonwealth v. Charleston, CP-51-CR-0010713-2008, Opinion (Phila. C.C.P. May 27, 2010) (Overton, J.) ("Trial Ct. Op.").
After Judge Overton denied Charleston's post-sentence motions, Charleston filed a timely direct appeal claiming:
1. The trial court erred in failing to suppress the statements he made to the police as the fruits of an unlawful arrest and detention and as the fruit of impermissible questioning in violation of Missouri v. Seibert, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004).
2. The court erred in permitting impermissible hearsay through the decedent's mother.
3. The court erred in permitting evidence regarding Charleston's tattoos.
4. The court erred in permitting hearsay evidence regarding the search of the sewer.
5. The court erred in precluding Charleston from presenting evidence that the victim was known to have a criminal record for violent conduct.
Commonwealth v. Charleston, CP-51-CR-0010713-2008, Statement of Matters Complained of on Appeal (Phila. C.C.P. filed Dec. 3, 2009). On May 27, 2010, Judge Overton issued an opinion recommending that the judgment of sentence be affirmed. Trial Ct. Op. On February 18, 2011, the Superior Court affirmed the judgment of sentence. Commonwealth v. Charleston, 3226 EDA 2009 (Pa. Super. Feb. 18, 2011) ("Superior Ct. Direct Op."). The Pennsylvania Supreme Court denied Charleston's petition for allowance of appeal on September 27, 2011. Commonwealth v. Charleston, No. 280 EAL 2011, 612 Pa. 696, 30 A.3d 486 (Pa. Sept. 27, 2011).
On February 2, 2012, Charleston filed a counseled petition pursuant to Pennsylvania's Pennsylvania's Post-Conviction Relief Act ("PCRA"), 42 Pa. C.S.A. §§ 9541 - 9551, claiming that trial counsel was ineffective in:
1. failing to request a jury instruction regarding hearsay testimony provided by the victim's mother,
2. failing to object to improper remarks by the prosecutor in closing argument regarding his characterization of Charleston's credibility and a possible motive,
3. failing to object when the court instructed the jury that the prosecution had proven Charleston had a *643 bad reputation for telling the truth, and
4. presenting a defense of self-defense, and failing to argue homicide by misadventure or criminal negligence.
Commonwealth v. Charleston, CP-51-CR-0010713-2008, Petition for Relief under the Post Conviction Relief Act (Phila. C.C.P filed Feb. 2, 2012).[3] On November 26, 2012, Judge Overton denied Charleston's PCRA petition without a hearing. Commonwealth v. Charleston, CP-51-CR-0010713-2008, Order (Phila. C.C.P. Nov. 26, 2012).
Charleston filed a timely appeal presenting the same four claims listed above. Commonwealth v. Charleston, CP-51-CR-0010713-2008, Statement of Errors to be Complained of on Appeal (Phila. C.C.P. filed Dec. 24, 2012). On January 11, 2013, Judge Overton issued an opinion explaining his denial of PCRA relief. Commonwealth v. Charleston, CP-51-CR-0010713-2008, Opinion (Phila. C.C.P. Jan. 11, 2013). On June 6, 2014, the Superior Court affirmed the denial of PCRA relief. Commonwealth v. Charleston, 94 A.3d 1012 (Pa. Super. 2014) (" Superior Ct. PCRA Op."). The Pennsylvania Supreme Court denied Charleston's petition for allowance of appeal on December 23, 2014. Commonwealth v. Charleston, 434 EAL 2014, 628 Pa. 636, 104 A.3d 523 (Pa. Dec. 23, 2014).
Charleston's counsel filed this habeas petition on his behalf on March 20, 2015, claiming:
1. "The Pennsylvania Courts have erroneously and unreasonably applied the rule of ... Seibert..., in allowing the admission of the confession of Petitioner which was obtained after the assigned detective conducted a full custodial interrogation of the Petitioner without giving him Miranda warnings."
2. "The Pennsylvania Courts have erroneously and unreasonably applied the due process rule of Spencer v. Texas, 385 U.S. 554, 563[ 87 S.Ct. 648, 17 L.Ed.2d 606] (1967), by allowing tattoo evidence which deprived Petitioner of his right to a fundamentally fair trial."
3. "The Pennsylvania Courts erroneously and unreasonably applied Strickland v. Washington, [466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674] (1984), in rejecting without a hearing Petitioner's claims of ineffective assistance of counsel and thus denying him due process of law." The petition identifies three specific instances of ineffectiveness:
a. Trial counsel failed to request a proper instruction regarding the hearsay testimony of the victim's mother,
b. Trial counsel failed to object when the court instructed the jurors that Petitioner had a bad reputation for telling the truth in his closing instructions.
c. Trial counsel failed to ask that the jury be instructed on involuntary manslaughter or homicide by misadventure.
Doc. 1 ¶ 12 GROUNDS ONE-THREE. Charleston's counsel filed a memorandum of law in support of the petition on August 7, 2016. Doc. 9. On May 9, 2016, the District Attorney filed a response to the habeas petition, arguing that all but the first of *644 Charleston's claims are procedurally defaulted and all of them are meritless. Doc. 18. Petitioner's counsel filed a reply on June 22, 2016. Doc. 20. The Honorable Joseph F. Leeson referred the case to the undersigned for a Report and Recommendation. Doc. 2.
II. LEGAL STANDARDS
A. Exhaustion & Procedural Default
Before the federal court can consider the merits of a habeas claim, the petitioner must comply with the exhaustion requirement of section 2254(b). Exhaustion requires a petitioner to "give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999). In addition, federal constitutional claims must be fairly presented to the state courts, meaning that the petitioner must present the same factual and legal basis for the claim to the state court to put the state court "on notice that a federal claim is being asserted." McCandless v. Vaughn, 172 F.3d 255, 261 (3d Cir. 1999).
The doctrine of procedural default is closely related to the exhaustion requirement. If the petitioner has failed to present his claims to the state court and he is now precluded from doing so based on a state procedural rule, the claim is subject to the rule of procedural default. See Werts v. Vaughn, 228 F.3d 178, 192 (3d Cir. 2000). Likewise, it is not enough that the petitioner present his claims to the state court; he must also comply with the state's procedural rules in presenting his claims, thereby giving the state courts a full and fair opportunity to address them. A failure to do so results in a procedural default. Coleman v. Thompson, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).
[A] state prisoner's habeas claims may not be entertained by a federal court "when (1) 'a state court has declined to address those claims because the prisoner had failed to meet a state procedural requirement,' and (2) 'the state judgment rests on independent and adequate state procedural grounds.' " Walker v. Martin, 562 U.S. [307, 316], 131 S.Ct. 1120, 179 L.Ed.2d 62 (2011) (quoting Coleman, 501 U.S. at 729-30, 111 S.Ct. 2546 ).
Maples v. Thomas, 565 U.S. 266, 132 S.Ct. 912, 922, 181 L.Ed.2d 807 (2012). A decision based on a state procedural rule is considered independent if it does not rely on the merits of the federal claim or rest primarily on federal grounds. Harris v. Reed, 489 U.S. 255, 260, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) ; see also Ake v. Oklahoma, 470 U.S. 68, 75, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). "[A] state procedural ground is not 'adequate' unless the procedural rule is 'strictly or regularly followed,' " Johnson v. Mississippi, 486 U.S. 578, 587, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988), and the rule "speaks in unmistakable terms." Doctor v. Walters, 96 F.3d 675, 683 (3d Cir. 1996) (abrogated on other grounds, Beard v. Kindler, 558 U.S. 53, 130 S.Ct. 612, 175 L.Ed.2d 417 (2009) ). Thus, the procedural disposition must comport with similar decisions in other cases such that there is a firmly established rule that is applied in a consistent and regular manner "in the vast majority of cases." Banks v. Horn, 126 F.3d 206, 211 (3d Cir. 1997) (quoting Dugger v. Adams, 489 U.S. 401, 410 n.6, 109 S.Ct. 1211, 103 L.Ed.2d 435 (1989) ).
If a claim is found defaulted, the federal court may address it only if the petitioner establishes cause for the default and prejudice resulting therefrom, or that a failure to consider the claim will result in a fundamental miscarriage of justice. Werts, 228 F.3d at 192 (citing *645 McCandless, 172 F.3d at 260 ; Coleman, 501 U.S. at 731, 111 S.Ct. 2546 ). To meet the "cause" requirement to excuse a procedural default, a petitioner must "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." Id. at 192-93 (quoting and citing Murray v. Carrier, 477 U.S. 478, 488-89, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986) ). To establish prejudice, the petitioner must prove " 'not merely that the errors at ... trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.' " Id. at 193.
In order for a petitioner to satisfy the fundamental miscarriage of justice exception to the rule of procedural default, the Supreme Court requires that the petitioner show that a "constitutional violation has probably resulted in the conviction of one who is actually innocent." Schlup v. Delo, 513 U.S. 298, 327, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995) (quoting Carrier, 477 U.S. at 496, 106 S.Ct. 2639 ). This requires that the petitioner supplement his claim with "a colorable showing of factual innocence." McCleskey v. Zant, 499 U.S. 467, 495, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991) (citing Kuhlmann v. Wilson, 477 U.S. 436, 454, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986) ). In other words, a petitioner must present new, reliable evidence of factual innocence. Schlup, 513 U.S. at 324, 115 S.Ct. 851.
B. Merits Review
The federal courts' habeas review is limited in nature. See Werts, 228 F.3d at 195 (describing limits on judicial review imposed by the Antiterrorism and Effective Death Penalty Act of 1996). A petition for habeas corpus may only be granted if (1) the state court's adjudication of the claim "resulted in a decision contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or if (2) the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2). Factual issues determined by a state court are presumed to be correct, rebuttable only by clear and convincing evidence. Werts, 228 F.3d at 196 (citing 28 U.S.C. § 2254(e)(1) ).
The Supreme Court has explained that "[u]nder the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). With respect to "the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413, 120 S.Ct. 1495. The "unreasonable application" inquiry requires the habeas court to "ask whether the state court's application of clearly established federal law was objectively unreasonable." Id. at 409, 120 S.Ct. 1495. As the Third Circuit has noted, "an unreasonable application of federal law is different from an incorrect application of such law and a federal habeas court may not grant relief unless that court determines that a state court's incorrect or erroneous application of clearly established federal law was also unreasonable." Werts, 228 F.3d at 196 (citing Williams, 529 U.S. at 411, 120 S.Ct. 1495 ).
*646 III. DISCUSSION [4]
A. Evidence Summary
Before turning to Charleston's claims, I will summarize the trial evidence. As noted above, William Stanton was shot and killed inside 2428 North 25th Street on June 15, 2008. The Commonwealth's theory was that Charleston shot Mr. Stanton "over drugs and money." N.T. 8/18/09 at 178. In her opening statement, the prosecutor acknowledged that Mr. Stanton was a known drug dealer in the neighborhood. Id. at 180-81.[5] There were no witnesses to the shooting.
Mr. Stanton lived with his mother at 2424 North 25th Street. N.T. 8/19/09 at 7; 8/20/09 at 31-32, 42. Their next door neighbor David Taylor testified that he was in his kitchen on the late morning, early afternoon of June 15, 2008, when he heard three or four noises that sounded like a car backfiring, fire crackers, or gunshots. N.T. 8/19/09 at 74, 79-80. A few seconds later he came outside, and twenty or thirty seconds after that he saw Charleston come out of 2428 North 25th Street and jog across the street and down Hagert Street. Id. at 83-85.
Travis Leslie testified that he and his brother Tracey Leslie lived at 2428 North 25th Street. Travis testified that he left the house for work at about 11:30 a.m. N.T. 8/19/09 at 154, 157-58, 164. Between 1:30 and 2:00, Travis received a call telling him that something had happened at his house. Id. at 165. Travis then called his brother, Tracey. Id. Tracey Leslie testified that when he arrived back home he saw Mr. Stanton lying unresponsive on the floor between the living room and dining room. Id. at 20-22, 26-27. Tracey saw a blood stain and hole towards the back of Mr. Stanton's shirt, and he could not find a pulse. Id. at 28-29. He went outside and called 911. Id. at 21-22, 29. Travis Leslie testified that when he arrived at the house, he saw paramedics taking Mr. Stanton out on a stretcher. Id. at 166. He also saw Charleston that night. When Travis asked Charleston if he knew what happened in the house, Charleston replied that he was not there. Id. at 169, 172.
The victim's mother, Clara Stanton, testified that her son had between $600 and $650 with him when she last saw him between 10:00 and 11:00 in the morning of June 15, 2008. N.T. 8/20/09 at 45-46, 89-90. She then went to sleep, and when she woke up, she could not find or reach him.[6] Id. at 44. When she left to go shopping at 2:15 or 2:30, she saw Charleston coming from the direction of 2428 North 25th Street and asked if he had seen William, and Charleston replied that he had not.
*647 Id. at 48, 51. Neither the money nor Mr. Stanton's wallet or identification card was ever recovered. Id. at 47, 96.
After her son's death, Ms. Stanton had a conversation with Nashua Sanders, who frequently visited family next door to Ms. Stanton.[7] According to Ms. Stanton, three weeks after her son's death, Ms. Sanders told her about a conversation that she (Ms. Sanders) had with Charleston about a week before the shooting, in which Charleston said that he planned to rob Mr. Stanton. N.T. 8/20/09 at 109, 111-12.[8] Ms. Stanton also testified that she did not see Charleston in the days following the incident, which was unusual because he was normally at her house every morning. Id. at 56-57. The day after the murder, people in the neighborhood told her that Charleston was involved in her son's death. Id. at 57.
On July 16, 2008, nearly a month after Mr. Stanton's death, Officer Anthony Soliman and his partner received information regarding a suspect in a gang-related homicide. N.T. 8/20/09 at 166-67. The officer observed Charleston on the street near 25th and Hagert Streets and believed that he matched the description. Id. at 168. After Charleston entered a house at 2432 North 25th Street, the officer knocked on the door and asked to speak to Charleston. Charleston came out, was patted down for weapons, and was placed in the back of the patrol car. Id. at 169-70. Charleston denied any knowledge of the homicide the officers were investigating. Id. at 171. However, Ms. Stanton approached them and told Officer Soliman that the person in the back of the car killed her son. Id. at 172. Officer Solliman transported Charleston to the police station where homicide detectives eventually interviewed him. Id. at 173, 175.
Homicide Detective Greg Singleton spoke with Charleston when he was brought to the station, but believed he was under the influence of alcohol. N.T. 8/21/09 at 150.[9] At about 10:00 a.m. the next day, Detective Singleton began questioning Charleston, starting with routine biographical information (birthdate, height, weight, nickname, etc.). Id. at 151. The detective then "asked him about the incident involving the murder of William Stanton. And he described his involvement in the incident. And at some point I stopped him and ... read him his rights and ... proceeded to take a formal interview ...." Id. at 154.[10] According to the detective, Charleston "seemed eager to speak with me. He was calm and cooperative." Id.
The interview was conducted in question-and-answer form, and Detective Singleton read the interview into the trial record. N.T. 8/21/09 at 162-68. Charleston implicated himself in the shooting, but maintained that the victim pulled the gun and the shots were fired while the two were wrestling over the gun. Id. at 162-64, 168.
Charleston, who took the stand in his own defense, testified to the same effect, *648 but in greater detail. N.T 8/24/09 at 40-43. He described himself and Mr. Stanton as "close friends" who were "always together." Id. at 33. Charleston stated that on the day in question, he and Mr. Stanton were smoking marijuana together on the corner and each purchased Xanax from a dealer passing by, and each took two Xanax pills (4 miligrams each). Id. at 52-56, 58. They entered the corner house to avoid being harassed by police, and a disagreement ensued because Charleston wanted to buy some of Mr. Stanton's Xanax but Mr. Stanton believed Charleston should have just purchased more from the dealer on the street. Id. at 38-39, 85-87. Mr. Stanton pulled a gun from his waistband, pointed it in Charleston's face, and snatched the sunglasses off Charleston's face. Id. at 40, 42, 92-95, 99. Mr. Stanton threatened to shoot Charleston for disrespecting him. Id. at 40, 96. Charleston grabbed the wrist of the hand holding the gun. Id. at 42. While they were wrestling, the gun went off, three shots in a row. Id. at 42, 109-11. After the shots, Charleston let go of Mr. Stanton's arm and they both fell to the ground. Id. at 43, 113. Charleston testified, as he had reported in his statement to Detective Singleton, that he took the gun and threw it in the sewer at the corner of Hagert. Id. at 44-45, 120; N.T. 8/21/09 at 163.
Dr. Sam Gulino, the Chief Medical Examiner, testified that Mr. Stanton died as a result of multiple gunshot wounds. N.T. 8/21/09 at 69. Dr. Gulino described three gunshot wounds which resulted in six visible wounds as each bullet traveled through Mr. Stanton's body. Id. at 70.[11] One shot entered the left chest area, traveled horizontally through both lungs and the heart, and exited the right side of Mr. Stanton's back. Id. at 74-75, 80-81.[12] Another shot entered Mr. Stanton's right lower abdomen just above the groin and exited the lower part of the right buttock. Id. at 75. A third shot entered the lower right thigh and exited thought the outer part of the right knee. Id. at 76. Based on the gun powder residue or soot on the entrance wounds and clothing, Dr. Gulino testified that the chest wound was not a contact wound, but was within eight inches of the gun's muzzle when it was fired. Id. at 77-78. Markings around the wound to the pelvic area showed the weapon was fired from less than three feet away, and the absence of markings around the thigh wound indicated that the weapon was fired from at least two feet away. Id. at 78-79. According to the toxicology report, the only drug in Mr. Stanton's system was Zanax (Alprazolam ). Id. at 86.
The Commonwealth also called Officer Louis Grandizio as a firearms expert. N.T. 8/21/09 at 116. Officer Grandizio examined two fired cartridge casings that were retrieved from the scene and a bullet retrieved from Mr. Stanton, all of which were .45 caliber. Id. at 123-25. Markings on the casings showed they were fired by the same weapon, but there was no way to determine whether the bullet was fired from the same gun. Id. at 125-26. The officer explained how a .45 caliber semi-automatic handgun works and explained that one must pull the trigger each and every time for the gun to fire. Id. at 127-28. Any obstruction to the slide on the exterior of the gun will jam the gun and it will not respond to further pulls of the trigger. Id. at 131-32.
*649 B. Claim One-Admission of Charleston's Confession
In his first claim, Charleston argues that the Pennsylvania courts unreasonably applied the rule of Seibert in allowing the admission of his confession which was obtained after he was interrogated without Miranda warnings. Doc. 9 at 3-6; Doc. 20 at 2-8. As will be discussed, there was no majority opinion in Seibert, and the District Attorney argues that there is no clearly established federal law under Seibert. Doc. 18 at 18 & n.3. In the alternative the District Attorney argues that Charleston is not entitled to relief under Seibert even if it is clearly established.[13]
In order to understand the parties' arguments, a brief analysis of the landscape regarding the admission of so called two-step confessions and a more lengthy discussion of the Seibert opinions are necessary. The foundation for this discussion is Miranda, which requires that "the accused must be adequately and effectively apprised of his rights [against self-incrimination] and the exercise of those rights must be fully honored." Miranda v. Arizona, 384 U.S. 436, 467, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In Oregon v. Elstad, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), the Supreme Court confronted a scenario in which officers first obtained an un-Mirandized statement and then obtained a second Mirandized statement. Police came to the defendant's house with a warrant for his arrest for burglary and, during a brief (but concededly custodial) stop in the living room, a police officer said that he thought the suspect was involved in a burglary, and the suspect responded "Yes I was there." Id. at 301, 105 S.Ct. 1285. The suspect was then taken to the police station where he was read the Miranda warnings and provided a full confession. Id. at 301, 314-15, 105 S.Ct. 1285. The state appellate court had ruled that the Mirandized confession should have been suppressed, but the Supreme Court disagreed, focusing on whether coercive tactics were used in the first interrogation. Id. at 310-14, 105 S.Ct. 1285. Because no "deliberately coercive or improper tactics" were used, and both statements were made voluntarily, only the un-Mirandized statement had to be suppressed. Id. at 314, 105 S.Ct. 1285.
In Elstad, the Court rejected a "the cat is out of the bag" theory, noting that "[t]his Court has never held that the psychological impact of voluntary disclosure of *650 a guilty secret qualifies as state compulsion or compromises the voluntariness of a subsequent informed waiver." 470 U.S. at 311-12, 105 S.Ct. 1285. Instead, the Court held that "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite Miranda warnings." Id. at 318, 105 S.Ct. 1285. The Elstad Court directed the courts to avoid a rigid rule.
[T]here is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of Miranda, was voluntary. The relevant inquiry is whether, in fact, the second statement was also voluntarily made. As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements.
470 U.S. at 318, 105 S.Ct. 1285. Factors relevant to the analysis include " 'who initiated the [initial] interrogation, the time that elapsed between the two interrogations, the extent to which the same police were involved in both interrogations, the manner in which the [initial]interrogation was conducted,' and any other relevant factors." United States v. Latz, 162 Fed.Appx. 113, 119 (3d Cir. 2005) (quoting United States v. Tyler, 164 F.3d 150, 158 (3d Cir. 1998) ).
The facts of Seibert presented a challenge to application of the ruling in Elstad, 542 U.S. 600, 124 S.Ct. 2601, namely the purposeful use of a two-step interrogation technique. 542 U.S. at 609, 124 S.Ct. 2601. The defendant was suspected in setting a fire which killed a mentally ill teenager living in her home. Police took her to the police station at 3:00 a.m. and questioned her for thirty to forty minutes, repeatedly squeezing her arm and suggesting that the victim was intended to die in the fire. Id. at 604-05, 124 S.Ct. 2601. After the defendant finally admitted that this was true, she was given a fifteen -to- twenty minute break. The same officer then obtained a Miranda waiver and resumed questioning by referring to the statement she had just made, and she again admitted the victim was intended to die in the fire. Id. The evidence showed that the police purposely used this technique as part of a "question-first practice of some popularity" among police departments. Id. at 610-11, 124 S.Ct. 2601. At trial, the pre-warning statement was suppressed, but the post-warning statement was admitted into evidence.
The Supreme Court determined that the post-warning statement was inadmissible. Justice Souter, writing for the four-member plurality (joined by Justices Stevens, Ginsburg, and Breyer), concluded that two-step interrogation would reasonably be seen as "parts of a continuum, in which it would have been unnatural to refuse to repeat at the second stage what had been said before." Id. at 616-17, 124 S.Ct. 2601. In finding the Miranda warnings ineffective, the plurality focused on factors such as "the completeness and detail of the ... first ... interrogation, the overlapping content of the two statements, the timing and setting of the first and second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." Id. at 615, 124 S.Ct. 2601. Under the facts presented,
[t]hese circumstances must be seen as challenging the comprehensibility and efficacy of the Miranda warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that she retained a choice about continuing to talk.
Id. at 617, 124 S.Ct. 2601 (footnote omitted).
*651 Although Justice Breyer concurred in the plurality opinion, he wrote separately to state that he would adopt a simple rule: "Courts should exclude the 'fruits' of the initial unwarned questioning unless the failure to warn was in good faith. Seibert, 542 U.S. at 617, 124 S.Ct. 2601 (Breyer, J., concurring).
Justice Kennedy, who concurred in the judgment, explained his disagreement with the plurality's opinion.
The plurality concludes that whenever a two-stage interview occurs, admissibility of the postwarning statement should depend on "whether [the] Miranda warnings delivered midstream could have been effective enough to accomplish their object" given the specific facts of the case." ... In my view, this test cuts too broadly.
Seibert, 542 U.S. at 621-22, 124 S.Ct. 2601. Instead, in a case in which the two-step interrogation technique "was used in a calculated way to undermine the Miranda warning," "postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made." Id. at 622, 124 S.Ct. 2601.[14] Thus, Justice Kennedy focused not on whether a reasonable person in the suspect's shoes could appreciate his Miranda rights, but whether the police purposely used a two-step technique to undermine Miranda.[15]
Returning to Charleston's case, habeas relief is available only if the state court decision is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d) ( (1) & (2). Charleston argues that the Pennsylvania courts unreasonably applied Seibert. The District Attorney argues that Seibert does not provide any clearly established law. Doc. 18 at 18-24. "[C]learly established law for purposes of [ section] 2254(d)(1) includes only the holdings, as opposed to the dicta, of t[he Supreme Court's] decisions," as of the time of the relevant state-court decision. Woods v. Donald, --- U.S. ----, 135 S.Ct. 1372, 1376, 191 L.Ed.2d 464 (2015) (quoting White v. Woodall, 572 U.S. 415, 134 S.Ct. 1697, 1702, 188 L.Ed.2d 698 (2014) ).
As previously explained, three other justices joined Justice Souter's opinion in Seibert. Justice Kennedy concurred in the judgment, but wrote separately. Justice Breyer, who joined Justice Souter's opinion also wrote a concurring opinion, and four justices dissented. As discussed at length by the District Attorney, courts throughout the country have struggled to determine, what, if anything, is the holding of Seibert. Doc. 18 at 21-23. The Third Circuit has answered that question in the context of a direct appeal, applying Marks v. United States, 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977), which instructs lower courts how to identify the Court's holding where it lacks a majority opinion. In United States v. Naranjo, the Third Circuit determined that Justice Kennedy's opinion was controlling.
*652 Where, as in Seibert, no one view garners a majority of the Justices, the Supreme Court has instructed us on how to proceed. In Marks..., 430 U.S. [at] 193, 97 S.Ct. 990..., the Court explained, "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the 'holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.' " In Seibert, Justice Kennedy's opinion provides the narrowest rationale for resolving the issues raised by two-step interrogations where Miranda warnings are not administered until after police obtain an inculpatory statement.
Naranjo, 426 F.3d at 231 ; see also United States v. Kiam, 432 F.3d 524, 532 (3d Cir. 2006) ("This Court applies the Seibert plurality opinion as narrowed by Justice Kennedy;" holding that where Miranda violation was not deliberate, Elstad controls admissibility).[16]
The Pennsylvania Superior Court specifically rejected Naranjo in its decision in Charleston's case, finding instead that " Seibert establishes no new binding precedent." Commonwealth v. Charleston, No. 3226 EDA 2009, Opinion at 36 (Pa. Super. Feb. 18, 2011). Although this court is bound to follow the Third Circuit on the question whether a holding can be found in the opinions of Seibert, and thereby to reject the Superior Court's contrary decision, the relevant question is whether the Superior Court's decision is contrary to "clearly established" federal law. As interesting a discussion as this question may generate, it is ultimately unnecessary, as Charleston is not entitled to habeas relief under either Justice Kennedy's Seibert opinion[17] or Elstad.
Justice Kennedy's opinion offers Charleston no assistance because his opinion limited relief to cases in which the authorities purposely delayed warnings to undermine Miranda. Despite Petitioner's categorization of Detective Singleton's failure to administer Miranda warnings at the outset of his questioning as deliberate or intentional, Doc. 1 at 16; Doc. 9 at 5, there is no evidence in the record that Detective Singleton purposely declined to read Charleston the requisite warnings to undermine their efficacy.
At the suppression hearing, when asked how the interrogation proceeded once he had completed obtaining the biographical information, Detective Singleton stated:
I asked the defendant about the circumstances surrounding the murder of William Stanton, and he explained in some detail what occurred in the house. At some point, I stopped him and read him his rights and prepared the memorandum form for, you know, the sheets, the warnings for his rights, and he signed off on them.
N.T. 8/17/09 at 56. After Charleston signed the waiver form, Detective Singleton explained that he "then proceeded to take a statement from [Charleston], a formal statement." Id. Likewise at trial, the detective *653 testified that after he completed reviewing Charleston's biographical information, he asked Charleston about the murder of William Stanton and Charleston described his involvement. Detective Singleton again stated that "at some point, I stopped him and I read him his rights and we proceeded to take a formal interview." N.T. 8/21/09 at 154. On this record, there is no indication that Detective Singleton's failure to Mirandize Charleston was purposeful or part of a two-stage technique as in Seibert. Thus, Charleston is not entitled to habeas relief under Justice Kennedy's Seibert opinion.[18]
In the alternative, applying Elstad, the Superior Court found no Fifth Amendment violation.
Consistent with the rulings in Elstad and [ Commonwealth v. ] DeJesus [, 567 Pa. 415, 787 A.2d 394 (2001), abrogated on other grounds ], our analysis, ... hinges upon whether [Charleston's] warned statement after he waived his rights was knowing and voluntary. Detective Singleton testified at the suppression hearing as to the procedure he followed in administering Miranda warnings to [Charleston]. He testified that there were seven questions that were read to [Charleston] explaining his rights, among which were his right to remain silent, his right to an attorney even if he cannot afford one, and the fact that what he says can be used against him. N.T., 8/17/09, at 58-59. [Charleston] acknowledged receiving these rights by placing his initials at the conclusion of each answer.
From the beginning of Detective Singleton's interaction with [Charleston] on the morning of July 17th, [Charleston] was "immediately receptive" and was "very cooperative and eager to give his portion of the story." Id. at 70-71. During the interrogation, he was permitted to use a restroom and was given a sandwich and something to drink. Id. Under these circumstances, we have no difficulty concluding that [Charleston's] waiver of his rights and the subsequent statement were both knowing and voluntary. Accordingly, [Charleston] is not entitled to relief on his first question.
Superior Ct. Direct Op. at 37.
After carefully reviewing both the suppression hearing and trial transcripts, I find that the Superior Court's decision is neither contrary to nor an unreasonable application of Elstad, and did not result in an unreasonable determination of the facts. Here, although Charleston was in custody at the time Detective Singleton began taking his statement, there is no evidence of deliberate coercion or improper tactics. Charleston was taken into custody the night before, but was intoxicated. N.T. 8/21/09 at 150. He was given water and kept overnight. Id. at 198. The next morning he was given a cheese sandwich and water before the detective took his statement. Id. The Miranda warnings read to Charleston were complete and he acknowledged both verbally and by initialing them that he understood the rights he was waiving. Id. at 156-59.
*654 Although the pre-warning questioning in Charleston's case was certainly not as benign as the living room disclosure of a guilty secret in Elstad, the Superior Court's decision does not run afoul of Elstad.
We must conclude that, absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of Miranda warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights.
Elstad, 470 U.S. at 314, 105 S.Ct. 1285. Charleston is not entitled to relief on this claim.
C. Claim Two-Tattoo Evidence
Charleston also argues that his due process rights were violated by admission of evidence that he had a tattoo of the words "By any means necessary, fuck it, shit happens." Doc. 1 at 16; Doc. 9 at 6-10; Doc. 20 at 8-11.[19] The District Attorney argues that Charleston did not properly present his due process claim to the state courts, resulting in its default, and alternatively that the claim is meritless. Doc. 18 at 29-33.
As previously noted, in order to satisfy the exhaustion requirement, the petitioner must fairly present his claim to the state courts. Picard v. Connor, 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). This requires that the claim brought in the federal court be the substantial equivalent of that presented in the state courts. Id. at 278, 92 S.Ct. 509. Both the legal theory and the facts supporting a federal claim must have been presented to the state courts. Ross v. Petsock, 868 F.2d 639, 641 (3d Cir. 1989).
When Charleston presented the claim regarding the tattoo evidence to the Superior Court in his direct appeal, he framed the issue as being an error in state evidentiary rulings. "Did not the lower court err in its other evidentiary rulings, in particular, the admission of evidence of [Charleston's] tattoos...." Commonwealth v. Charleston, No. 3226 EDA 2009, 2010 WL 5903533, Brief for Appellant at *5 (Pa. Super. filed July 1, 2010). His summary of the argument stated that "[t]he lower court also erred by permitting the prosecutor to elicit testimony that [Charleston] had a series of tattoos ... [that] had no relevance, as there was no identification based on a tattoo; and this constituted an impermissible use of character to show propensity for violence." Id. at 13. The argument was limited to why the evidence was irrelevant and improper under the rules and caselaw of Pennsylvania and other states. Id. at 24-25. Guided by Charleston's claim and argument, the Superior Court ruled on the claim as one of state evidentiary rule. Superior Ct. Direct Op. at 42-43. "Appellant's main argument is that 'Pennsylvania clearly bars character evidence in a criminal case.' " Id. (quoting Brief for Appellant at 24). Relying on Pennsylvania Rule of Evidence 404(a)(1), the Superior Court concluded that "the trial court did not abuse its discretion in permitting the introduction of [the tattoo] evidence" because the tattoo evidence rebutted Appellant's testimony suggesting that he had a selfless character. Id. at 43.
*655 In his habeas reply brief, Charleston relies on his citation to Boliek v. Delo, 912 F. Supp. 1199, 1213 (W.D. Mo. 1995), to argue that he alerted the state court that he was presenting a federal claim. Doc. 20 at 10 (citing page 24 of his Brief on Direct Appeal and Baldwin v. Reese, 541 U.S. 27, 29, 124 S.Ct. 1347, 158 L.Ed.2d 64 (2004) (claim not fairly presented if state court "must read beyond a petition or brief ... that does not alert it to the presence of a federal claim") ). Although citation to Boliek may have alerted the Superior Court to the presence of a federal claim, it is the wrong federal claim. In Boliek, the District Court in Missouri found that the petitioner's trial counsel was ineffective for failing to object to the prosecutor's admission of his tattoo evidence. Specifically, applying Strickland v. Washington, 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the landmark case applicable to ineffective assistance of counsel claims, the District Court found that counsel's failure to object to the evidence fell below a reasonable standard of performance and the petitioner suffered prejudice as a result. There was no discussion of a due process violation as a result of the admission of the tattoo evidence.[20] Thus, Charleston's due process claim was not properly presented to the state courts. See Tome v. Stickman, 167 Fed.Appx. 320, 322-23 (3d Cir. 2006) (exhaustion requires petitioner to have presented "[b]oth the legal theory and facts underpinning the federal claim" to the state court) (quoting Evans v. Court of Common Pleas, De. Cnty., 959 F.2d 1227, 1231 (3d Cir. 1992) ).
Because Charleston cannot now present this claim to the state courts, see 42 Pa. C.S.A. §§ 9544(b) (governing waiver) & 9545(b) (PCRA statute of limitations), the claim is procedurally defaulted and can only be considered by the federal court if Charleston can show cause and prejudice or that a failure to consider the claim will result in a fundamental miscarriage of justice. See Werts, 228 F.3d at 192 (if exhaustion futile, claim defaulted). Charleston does not recognize his default, nor does he attempt to explain it, leaving the court without grounds to excuse the default. As discussed earlier, cause to excuse a default requires the petitioner to "show that some objective factor external to the defense impeded counsel's effort to comply with the State's procedural rule." Id. at 192-93 (quoting and citing Carrier, 477 U.S. at 488-89, 106 S.Ct. 2639 ). Counsel's ineffectiveness in failing to preserve a claim for review in state court can provide cause to excuse a procedural default. Edwards v. Carpenter, 529 U.S. 446, 451, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000) (citing Carrier, 477 U.S. at 488-89, 106 S.Ct. 2639 ). However, the ineffectiveness claim providing cause to excuse the default must itself be exhausted. Edwards, 529 U.S. at 453, 120 S.Ct. 1587. Here, Charleston has not given the state courts the opportunity to consider such a claim of ineffective assistance of trial counsel. Although he presented several such claims in his PCRA petition, he did not allege ineffectiveness based on counsel's failure to challenge the admission of the tattoo evidence on due process grounds. Therefore, the ineffectiveness of trial counsel cannot provide cause to excuse the default of his due process claim.
A procedural default can also be excused if a failure to consider the claim will result in a fundamental miscarriage of justice. Coleman, 501 U.S. at 750, 111 S.Ct. 2546. As noted previously, this would require *656 Charleston to show that a "constitutional violation has probably resulted in the conviction of one who is actually innocent," Schlup, 513 U.S. at 327, 115 S.Ct. 851 (quoting Carrier, 477 U.S. at 496, 106 S.Ct. 2639 ), by supplementing his claim with "a colorable showing of factual innocence." McCleskey, 499 U.S. at 495, 111 S.Ct. 1454 (citing Kuhlmann v. Wilson, 477 U.S. 436, 454, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986) ). Charleston has failed to present any new evidence establishing his factual innocence.
D. Claims Three-Five-Ineffective Assistance of Counsel
In his final three claims, Charleston argues that his trial counsel was ineffective for failing to request a proper jury instruction regarding the statement of Nashua Sanders, failing to request an instruction on involuntary manslaughter or homicide by misadventure, and failing to object during closing instructions when the judge commented on Charleston's reputation for telling the truth. Docs. 1 at 17; 9 at 11-19. The District Attorney responds that the ineffectiveness claims are defaulted because Charleston failed to comply with Pennsylvania procedure in presenting the claims to the Superior Court on collateral appeal. Doc. 18 at 33. In his memorandum of law, Charleston relies on the dissent in the Superior Court's opinion to argue that the Superior Court's decision is erroneous and amounts to a denial of due process. Doc. 9 at 20-21.
The District Attorney's argument requires an initial discussion of the appropriate deference owed to the Superior Court's waiver analysis. I begin with that discussion before turning to each ineffectiveness claim.
1. Standard Applicable to Default Analysis
Careful review of the Superior Court's opinion reveals that it found the first two of Charleston's three ineffectiveness claims waived. Specifically, as to his limiting instruction claim regarding Ms. Sanders, the Superior Court found that Charleston failed to develop an argument or cite pertinent authority that the instruction was flawed, and similarly failed to develop an argument that counsel had no reason not to request an additional instruction and that the result would have been different had counsel requested a second instruction. Superior Ct. PCRA Op. at 1029-31. Therefore, applying Pennsylvania Appellate Rule 2119,[21] the Superior Court found *657 this claim waived.[22] Likewise, with respect to Charleston's claim that counsel failed to request an instruction on involuntary manslaughter or homicide by misadventure, the Superior Court found that Charleston failed to develop the claim, resulting in waiver. Id. at 1037-38.
Rather than challenging the independence and/or adequacy of the Pennsylvania appellate waiver rule, Charleston argues that his ineffectiveness claims were not waived under state law, essentially asking this court to reject the state court's waiver findings. See Docs. 9 at 21-22; 20 at 11-13. Citing Estelle v. McGuire, 502 U.S. at 67-68, 112 S.Ct. 475, the District Attorney argues that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." Doc. 18 at 38 (quoting Estelle, 502 U.S. at 67-68, 112 S.Ct. 475 ). Because a majority of the Superior Court judges determined that Charleston's brief was deficient under state law, the District Attorney argues, the federal court is bound by the finding.
Several courts have relied on Estelle's language in the context of procedural default to decline to determine whether a violation of state procedural rules actually occurred. See e.g., Johnson v. Mechling, 541 F. Supp.2d 651, 680 (M.D. Pa. 2008) ("On habeas review, this Court must determine whether the procedural rule applied by the state court is independent and adequate, but is not at liberty to second-guess the state court's application of its own independent and adequate rule."); Klein v. Kelchner, Civ. No. 02-8451, 2003 WL 22204561, at *3 (E.D. Pa. Sept. 4, 2003) (VanAntwerpen, J., approving and adopting Report & Recommendation, Rapoport M.J.) (not the province of this court to decide issues of state law in context of procedural default). However, both sides refer this court to a more recent decision by the Third Circuit. In Rolan v. Coleman, 680 F.3d 311 (3d Cir. 2012), the Third Circuit rejected the Superior Court's waiver determination regarding two claims. In the first, the Superior Court found a claim waived and the District Court found the claim procedurally defaulted based upon Rolan's failure to comply with Pennsylvania Rule of Appellate Procedure 1925(b), which requires a concise statement of issues to be presented on appeal. After conducting its own review of Rolan's 1925(b) statement, the Third Circuit determined that the petitioner had "substantially, if imperfectly," complied with the requirements of Rule 1925(b) and found that the District Court had erred in finding the claim defaulted. 680 F.3d at 318. The District Court found a second claim procedurally defaulted based on Rolan's failure to *658 comply with Pennsylvania Rule of Appellate Procedure 2119(a), which requires that the argument section of the brief be divided into as many parts as there are questions and requires "such discussion and citation of authorities as are deemed pertinent." 680 F.3d at 318. The Third Circuit determined that "Rolan's discussion sufficiently identified his claims for the court" and noted his "substantial compliance" with Rule 2119(a) in determining that "the Superior Court's application of Rule 2119(a) should not preclude our consideration of Roland's federal habeas claim." Id. at 319.
Relying on Rolan, Charleston argues that review of his ineffectiveness claims should not be barred based on the Superior Court's determination that the claims were waived. Doc. 20 at 11-13. The District Attorney argues for a much more narrow exception to allow for review of a state court's state law procedural ruling in the " 'atypical instance [where] the [r]ule would serve no perceivable state interest,' such as where unusual circumstances make punctilious adherence to state rule 'so bizarre as to inject an Alice-in-Wonderland quality into the proceedings.' " Doc. 18 at 38 n. 10 (quoting Lee v. Kemna, 534 U.S. 362, 378-83, 122 S.Ct. 877, 151 L.Ed.2d 820 (2002) ).
I reject the District Attorney's narrow reading and conclude that the federal court has a duty to review the propriety of a state court ruling that bars consideration of a federal claim. In Cone v. Bell, 556 U.S. 449, 129 S.Ct. 1769, 173 L.Ed.2d 701 (2009), the state argued that the petitioner's Brady claim was procedurally defaulted because, among other things, the state court found it waived. The Supreme Court, after examining the procedural history, determined that the claim had been properly preserved and exhausted in the state courts and was not waived, 556 U.S. at 467-68, 129 S.Ct. 1769, noting that "[w]e have an independent duty to scrutinize the application of state rules that bar our review of claims." Id. at 468-69, 129 S.Ct. 1769. Therefore, in addressing each of Charleston's ineffectiveness claims, I will first assess any waiver finding by the Superior Court in light of my review of Charleston's brief on PCRA appeal.
2. Ineffectiveness of Counsel-Instruction Regarding Nashua Sanders' Statement
With respect to trial counsel's failure to request a proper limiting instruction regarding the statement made by Nashua Sanders, I concur with the Superior Court's waiver finding.[23] The Superior Court explained that Pennsylvania has adopted a three-part test to evaluate ineffectiveness claims. The petitioner must show that (1) his underlying claim is of arguable merit; (2) counsel had no reasonable basis for his action or inaction; and (3) the petitioner suffered actual prejudice as *659 a result. Superior Ct. PCRA Op. at 1030 (citing Commonwealth v. Pierce, 515 Pa. 153, 527 A.2d 973 (1987) ). The Superior Court concluded that Charleston had failed to develop any of the three prongs of the Pierce test.
In his first issue, [Charleston] asserts that trial counsel should have requested a "proper limiting instruction" for the testimony by Ms. Stanton repeating the statement made to her by Nashua Sanders. (Appellant's Brief, at 3). He contends that the statement was used as substantive evidence of his intent to commit murder and robbery. (See id. ) We disagree.
[Charleston] argues that the contemporaneous instruction given sua sponte by the trial court was "equivocal" and trial counsel was ineffective for "failing to demand a jury instruction that would have made it unequivocally clear that the statement of Nashua Sanders was not, under any circumstances, to be considered for the truth of its content." (Id. at 12; see also id. at 7-13). [Charleston] argues that "he was surely prejudiced." (Id. at 13). This issue is waived and would not merit relief.
....
Next, we note that, aside from the cursory conclusion that "he was surely prejudiced" and a bald citation to Strickland..., and citation to authority on direct appeal, [Charleston] fails to develop an argument or present pertinent authority that the court's use of the colloquial expression "not necessarily" rendered its instruction fatally equivocal. (See Appellant's Brief, at 12-13).
Similarly, he fails to develop an argument that counsel had no reasonable basis not to request an additional instruction, or a reasonable probability that, but for counsel's alleged unprofessional error in not requesting a second instruction, the result of the proceedings would have been different. (See id. at 7-13). Therefore, [Charleston] fails to establish any of the three prongs of the Pierce test. Accordingly, [Charleston's] first issue is waived.
Superior Ct. PCRA Op. at 1021 (emphasis in original) (internal footnote omitted).
After reviewing Charleston's Appellate Brief, I conclude that the Superior Court properly determined that this claim was waived. After reciting the relevant facts, quoting a portion of the prosecutor's closing argument in which she focused on Ms. Stanton's testimony regarding Ms. Sanders' statement, and reciting the contemporaneous instruction given by the court, Charleston cited two direct appellate cases and argued that the instruction given failed to eliminate the possibility that the jury could consider the statement as substantive evidence of intent. Appellant's Brief at 7-11. He concluded by arguing "[s]ince [Charleston's] intent was the key issue for the jury to resolve, he was surely prejudiced," citing Strickland. Appellant's Brief at 12-13. Even if Charleston's citation to the two state cases involving admission of hearsay were sufficient to establish that the underlying claim had merit, the only discussion of prejudice was to assert that "[s]ince [Charleston's] intent was the key issue for the jury to resolve, he was surely prejudiced" with a citation to Strickland. He offered no argument or pertinent caselaw to establish that the admission of such hearsay evidence regarding motive could result in a different result, and I am not able to say that he substantially complied with the governing state rules. I therefore conclude that Charleston has defaulted this claim.[24]
*660 3. Ineffectiveness of Counsel-Jury Charges for Involuntary Manslaughter and Homicide by Misadventure
In his next ineffectiveness claim, Charleston complains that his trial counsel failed to request instructions on involuntary manslaughter and homicide by misadventure. Again, the Superior Court found the claim waived under state law because he had not developed the claim in his brief.
Once again, [Charleston] fails to develop an argument for his claim in light of the well-settled three pronged Pierce test for ineffectiveness analysis. Instead, citing cases involving direct appeals, [Charleston] merely asserts that he was entitled to an instruction on homicide by misadventure and involuntary manslaughter. (See Appellant's Brief, at 19). Accordingly, [Charleston's] claim is waived.
Superior Ct. PCRA Op. at 1025 (internal footnote omitted).
After reviewing Charleston's appellate brief, I agree with the Superior Court's conclusion that this claim is waived. Although Charleston specifically argued that he was entitled to the jury instructions at issue (homicide by misadventure and involuntary manslaughter) and cited cases in which such charges were found appropriate, see Appellant's Brief at 17-19, he failed to provide any support for his contention that trial counsel "could have no reasonable basis for failing" to request these instructions, and cited only Strickland in arguing that counsel's failure to request the instructions resulted in prejudice, arguing that "the outcome of this trial may well have been different" had counsel done so. Id. at 20.[25]
*661 4. Ineffectiveness of Counsel-Court's Comment on Credibility
Finally, Charleston argues that his counsel was ineffective for failing to object when, "in the course of his closing instructions to the jury, the trial judge advised the jurors that [Charleston] had 'a bad reputation for telling the truth,' where there was no such evidence presented at trial." Doc. 1 at 17. The District Attorney argues that the claim is procedurally defaulted and, in the alternative, meritless. Doc. 18 at 33-35, 45-47.
Beginning with the District Attorney's default argument, I disagree that this claim is defaulted. A careful reading of the Superior Court decision establishes that, although the Superior Court found the remainder of Charleston's ineffective counsel claims waived (numbered 1, 2, and 4 in the appellate opinion), the court ruled on this claim (numbered 3 in the appellate opinion) without finding any waiver. See Superior Ct. PCRA Op. at 1037 (rejecting claim on merits without reference to waiver). Thus, it is not procedurally defaulted in the federal court.
During the trial, the prosecution read a stipulation to the jury that Charleston had three prior convictions, namely that he had been found guilty of theft on September 1, 2004, unauthorized use of an automobile on December 17, 2004, and theft on July 26, 2005. N.T. 8/24/09 at 146. Then in the closing instructions, the judge stated the following:
The defendant took the stand as a witness. In considering the defendant's testimony[, y]ou are to follow the general instructions I gave you for judging the credibility of witnesses. You should not disbelieve the defendant's testimony merely because he is the defendant.
There was evidence tending to prove that the defendant has prior criminal convictions. And I'm speaking of the record introduced by the Commonwealth by stipulation. The assistant district attorney introduced evidence tending to show that the defendant's reputation for telling the truth is bad.
This evidence is not evidence of the defendant's guilt. You must not infer guilt from the evidence of prior convictions. This evidence may be considered by you for one purpose only, that is, to help you judge the credibility and weight of the testimony given by the defendant as a witness in this trial.
Id. at 226-27.
The Superior Court, relying on the stipulation, found that counsel was not ineffective.
[Charleston's] third claim is based on an apparent misreading of the record and the applicable law. Both counsel stipulated to the admission of [Charleson's] criminal record into evidence. (See N.T. Trial, 8/24/09, at 145-46). [Charleston] cites Commonwealth v. Randall, 758 A.2d 669, 678 (Pa. Super. 2000), appeal denied, 564 Pa. 707, 764 A.2d 1067 (2000), for the proposition that "evidence which is not in the record may not be cited by the court or the lawyers to suggest an outcome to the jury." (Appellant's Brief, at 17). The point is irrelevant because counsel stipulated to the *662 admission of [Charleston's] criminal record into evidence. [Charleston] offers no other authority in support of his claim. [Charleston's] third claim fails.
Superior Ct. PCRA Op. at 1024-25.
Charleston now argues that the stipulation "merely informed the jury that [he] had previously been convicted of Theft and Unauthorized Use of an Automobile (N.T. 8/24/09, 146). There was no evidence presented that [Charleston] actually had a bad reputation for telling the truth." Doc. 9 at 16. He thus draws a distinction between crimen falsi evidence and reputation evidence. The Superior Court did not recognize that Charleston was drawing this distinction, instead concluding that the crimen falsi evidence negated his argument as to reputation. I will therefore address this claim de novo.
In Pennsylvania, a witness's credibility can be challenged with crimen falsi evidence, see Commonwealth v. Harris, 442 Pa.Super. 116, 658 A.2d 811, 812 (1995) (quoting Commonwealth v. Randall, 515 Pa. 410, 528 A.2d 1326, 1329 (1987) ) ("evidence of prior convictions can be introduced for the purpose of impeaching the credibility of a witness if the conviction was for an offense involving dishonesty or false statements"), or by the witness's reputation or character for untruthfulness. See Pa.R.E. 608. As to the latter, evidence of reputation or character for truthfulness does not refer to specific instances of truthfulness or untruthfulness.
[Pennsylvania Rule of Evidence] 608 codifies the long established rule limiting the type of evidence admissible to challenge a witness's credibility, to evidence of the witness's general reputation for truthfulness or untruthfulness. Further, subsection (b)(1) of this rule specifically prohibits a witness from supporting or attacking another witness's credibility with instances of specific conduct.
Commonwealth v. Minich, 4 A.3d 1063, 1068 (Pa. Super. 2010) (internal citation omitted). Charleston's argument is that, by conflating these two forms of credibility challenge in the jury charge, the trial judge referred to reputation evidence not in the record.
The District Attorney argues that Charleston is engaging in "rather fine hair-splitting" and argues that "multiple theft convictions certainly tend to show that he is known (at least in the courts of Pennsylvania) for dishonesty." Doc. 18 at 46. Moreover, the District Attorney suggests that the "jury, of course, likely recognized the trial court's reference to 'reputation' as pertaining to the criminal convictions themselves, rather than some mysterious other evidence that had never been mentioned until that moment, particularly since the court made explicit reference to the convictions just two sentences earlier." Id.
Because I am looking at this claim through the lens of ineffective assistance of counsel, I must determine whether counsel's action (or inaction) was unreasonable and if there is a reasonable probability that, but for counsel's failure to object, the result of the trial would have been different. Strickland, 466 U.S. at 694, 104 S.Ct. 2052. I conclude that Charleston does not succeed on either Strickland prong.
First, I conclude that counsel's failure to object was not objectively unreasonable in the context of the case. Strickland requires that "[j]udicial scrutiny of counsel's performance must be highly deferential" and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " 466 U.S. at 689, 104 S.Ct. 2052 (citing *663 Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955) ).
Here, in discussing Charleston's prior criminal convictions during the jury instructions, the court referred to "evidence tending to show that [Charleston's] reputation for telling the truth is bad." The reference is sandwiched between sentences referring to Charleson's prior convictions. Rather than objecting and having the court focus its attention even further on Charleston's prior convictions, perhaps even repeating that he had two theft convictions and one conviction for unauthorized use of a vehicle, counsel may have strategically chosen to remain silent on the issue.[26]
With respect to the prejudice prong of the Strickland analysis, Charleston argues that counsel's failure to object to this charge was prejudicial because "his trial testimony denying an intentional killing was crucial to his defense." Doc. 9 at 16. However, Charleston has failed to establish that there is a reasonable probability of a different result if his counsel had objected to the charge. First, it is unlikely that the jury was well-versed in Pennsylvania evidentiary law or that it appreciated the distinction between Charleston's prior convictions and a reputation for untruthfulness. Moreover, as has been previously discussed, Charleston's version of the events was inconsistent with the physical evidence adduced at trial. Between the crimen falsi convictions and these discrepancies, the jury had other reasons to question Charleston's credibility. Charleston has failed to establish a reasonable probability that counsel's failure to object to the judge's use of the term reputation during the charge affected the outcome of the trial.
IV. CONCLUSION
Charleston is not entitled to relief on his Miranda claim whether the court applies Justice Kennedy's opinion in the Seibert case or under the Elstad decision. Justice Kennedy's opinion is applicable if the authorities purposely undermined Miranda, of which there is no evidence. The state courts' determination that Charleston's self-incrimination rights were not violated is not an unreasonable application of Elstad and is a reasonable determination of the facts. Charleston's due process/tattoo claim is procedurally defaulted because he claimed only an error of state law in his state court appeal. Two of his ineffective assistance of counsel claims were waived in the state court and defaulted in this court. The remaining ineffectiveness claim fails on the merits.
Accordingly, I make the following:
RECOMMENDATION
AND NOW, this 20th day of October 2016, IT IS RESPECTFULLY RECOMMENDED that the petition for writ of habeas corpus be DENIED. There has been no substantial showing of the denial of a constitutional right requiring the issuance of a certificate of appealability. Petitioner may file objections to this Report and Recommendation. See Local Civ. Rule 72.1. Failure to file timely objections may constitute a waiver of any appellate rights.

Miranda v. Arizona , 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (holding that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.").

The government did not introduce the pre-warning statement at trial and the admissibility of that statement is not at issue here.

At the suppression hearing, Detective Singleton testified that, as part of his investigation, he had taken the statement of a man named Gary Outlaw, who had told the detective that he saw Charleston and Stanton enter the residence at 2428 North 25th Street shortly before the shooting and that later that evening Charleston confessed to him that he had shot Stanton. See Suppr. N.T. at 48-51. Detective Singleton testified that Outlaw's statement was one of the main reasons he wanted to speak with Charleston. Id. at 51-2.
Ultimately, the contents of Outlaw's statement were not presented at trial, nor did Outlaw testify at trial. Rather, the jury heard testimony that police officers served Outlaw with a subpoena to appear on the first day of trial and that, after he failed to appear, Judge Overton issued a bench warrant for him, but the officers were unable to locate Outlaw to execute the warrant. See Trial N.T., Aug. 24, at 5-12.

The testimony in this paragraph is taken from the pretrial suppression hearing. At trial, Detective Singleton similarly testified that after completing the biographical form, he "asked [Charleston] about the incident involving the murder of William Stanton. And he described his involvement in the incident." See Trial N.T., Aug. 21, at 154. Detective Singleton also testified at trial that when he first asked Charleston about the incident, Charleston was "eager to speak with [him]" and was "very calm and cooperative." Id. Further, Detective Singleton testified that when he spoke with Charleston, he did not tell Charleston about any evidence that he (Detective Singleton) already had about the case. Id. at 193.

Similarly, at trial, Detective Singleton testified that, after Charleston described his involvement in the incident, "at some point I stopped him and I read him his rights and we proceeded to take a formal interview." See Trial N.T., Aug. 21, at 154.

Detective Singleton also testified that "[m]aybe 20 minutes elapsed" from the time he completed the biographical form and took Charleston's statement. Id. at 187-88.

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a petition for habeas corpus may be granted only if the state court's adjudication of the claim (1) "resulted in a decision contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A decision by a state court is contrary to clearly established federal law if it "applies a rule that contradicts the governing law set forth in our cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of" the Supreme Court "and nevertheless arrives at a result different from [the Court's] precedent." Price v. Vincent , 538 U.S. 634, 640, 123 S.Ct. 1848, 155 L.Ed.2d 877 (2003).

Justice Breyer, although joining the plurality, wrote separately to state that he would adopt the following rule: "Courts should exclude the 'fruits' of the initial unwarned questioning unless the failure to warn was in good faith." Id. at 617, 124 S.Ct. 2601 (Breyer, J., concurring). He considered this test functionally equivalent to the plurality's approach, and he also expressed agreement with Justice Kennedy's concurring opinion "insofar as it is consistent with [the "fruits" test] and makes clear that a good-faith exception applies." Id.

Such measures "should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the Miranda warning and of the Miranda waiver." Id. Examples of such curative measures include "a substantial break in time and circumstances" between the prewarning statement and the Miranda warning" or "an additional warning that explains the likely inadmissibility of the prewarning custodial statement." Id.

Judge Berzon concluded that of the four members of the plurality, only Justice Breyer, in his concurrence, arguably agreed with Justice Kennedy's "subjective-intent-of-the-interrogator position." See Rodriguez-Preciado , 399 F.3d at 1140 (Berzon, J., dissenting).

See Brecht v. Abrahamson , 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (holding that a federal court may grant habeas relief based on trial error only when that error " 'had substantial and injurious effect or influence in determining the jury's verdict' " (quoting Kotteakos v. United States , 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) ) ).

Charleston has not challenged the state courts' or the Magistrate Judge's Elstad analysis as such; rather, as discussed above, Charleston maintains that Seibert , not Elstad , is controlling in this case. In any event, the Court adopts the Magistrate Judge's determination that Superior Court's decision is neither contrary to nor an unreasonable application of Elstad and did not result in an unreasonable determination of the facts.

Despite this statement in Widi , there is First Circuit authority supporting the position that Justice Kennedy's concurrence is controlling. In United States v. Rogers , 659 F.3d 74 (1st Cir. 2011) (Souter, J.), Retired Associate Justice Souter, siting by designation, identified Justice Kennedy's concurrence as the "controlling opinion" in Seibert and analyzed the defendant's interrogation under that standard.

Prior to Heron , however, the Seventh Circuit had indicated that Justice Kennedy's concurrence is controlling. See United States v. Peterson , 414 F.3d 825, 828 (7th Cir. 2005) ("[Seibert ] holds that post-warning statements are inadmissible if they duplicate pre-warning statements intentionally elicited in an effort to evade Miranda. ").

Brady v. Maryland , 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

Commenting on the significance of circuit splits in this context, the court in Dennis observed that "[a]lthough the United States Supreme Court recently recognized that circuit splits may indicate a possibility of fairminded disagreement under AEDPA, it did so where the circuit split emerged out of an express reservation left by the Supreme Court on the precise question decided by the state court." Id. at 310 n.27. But, the court observed, the Supreme Court had "made no such express reservations when it comes to Brady materiality or an admissibility requirement." Id.

As the Magistrate Judge noted, because the state courts did not consider Charleston's claim under Justice Kennedy's analysis, this Court must apply de novo review to this limited portion of the claim. See R & R 22 n.17 (citing Appel v. Horn , 250 F.3d 203, 210 (3d Cir. 2001) (holding that the de novo standard applies when state court did not reach merits); Everett v. Beard , 290 F.3d 500, 507-08 (3d Cir. 2002) (appling de novo review when state courts failed utilize correct legal standard) ).

As courts applying this standard have observed, Justice Kennedy "did not articulate how a court should determine whether an interrogator used a deliberate two-step strategy." United States v. Williams , 435 F.3d 1148, 1158 (9th Cir. 2006). "For example, Justice Kennedy's opinion is silent as to what, if any, presumptions apply or which party bears the burden of proving or disproving deliberateness." Id. at 1159 n.11 ; see Capers , 627 F.3d at 477 ("In Seibert , because the record was clear that the interrogating officers intentionally and purposefully employed a technique in which they had been instructed...Justice Kennedy had no reason to explore how a court should determine when a two-step interrogation strategy had been executed deliberately.").

These factors are not exhaustive, however, nor are they to be applied in a mechanical fashion to each and every case, as such an approach would seem to undermine Justice Kennedy's concern that applying "a multifactor test... to every two-stage interrogation" may serve to undermine the clarity of Miranda. See Seibert , 542 U.S. at 622, 124 S.Ct. 2601 (Kennedy, J., concurring).

With respect to the second Seibert factor-concerning the overlapping content of the two statements-there is limited information in the record concerning the details of Charleston's initial statement, but it appears that the content of that statement was similar to the second statement. See Suppr. N.T. at 74-76. In any event, because this factor focuses on the response of the defendant, rather than the conduct of the officer, it appears to be of limited utility with respect to discerning the officer's state of mind, which is the focus of the present inquiry.

As indicated above, Charleston argues that the burden should be on the Government to show that the initial omission of the Miranda warnings was not intentional. But although a number of courts have held that the burden in these circumstances rests with the Government, it cannot be said that there exists "clearly established Federal law" on this matter. See United States v. Capers , 627 F.3d 470, 479 (2d Cir. 2010) (observing that the question "of which party bears the burden of proving deliberateness or absence thereof" is "unsettled," but agreeing with the Eighth Circuit that the burden rests on the prosecution to disprove deliberateness (citing United States v. Ollie , 442 F.3d 1135, 1142 (8th Cir. 2006) ). In any event, even if it were clearly established that the Government bears the burden on this issue, there is a preponderance of evidence in this case that the omission of the Miranda warnings was not deliberate.

Charleston does not contend that his trial testimony was compelled by the admission of his statement. See Sierra v. Bartowski , No. CIV.A. 11-1860 RMB, 2012 WL 4504246, at *11 (D.N.J. Sept. 27, 2012) (finding that the petitioner did not show that the admission of his confession caused prejudice under Brecht when, among other factors, "at no point did Petitioner assert that he would not have testified at trial had he had his confession deemed inadmissible or that his testimony could have been substantively different from the one he gave during the trial"). Moreover, in view of the evidence that Charleston had shot Stanton, "a self-defense theory was the only recourse available" to Charleston to justify the shooting, and it is more likely than not that he would have testified even if his statement had not been admitted. See Burks v. Perini , 810 F.2d 199 (6th Cir. 1986) (concluding that the government's use of the defendant's involuntary statement did not induce him to testify on his own behalf when a self-defense theory was the only recourse available to the defendant).

Charleston's presence at 2428 North 25th Street at the time of the shooting was established not only by his own testimony but also by a witness who, on the day of the shooting, shortly after hearing gunshots in the area, saw Charleston exit the house breathing heavily and then jog away. See Trial N.T., Aug. 19, at 73-86.

On direct appeal, the Superior Court held that evidence of Charleston's tattoo was appropriately offered to rebut testimony offered by Charleston concerning his good character-namely, Charleston's testimony that he had an aversion to firearms and that, following the shooting, he removed the firearm from the house and dumped it in the sewer out of concern for public safety. See Charleston , 16 A.3d at 528-29.

As the Magistrate Judge noted, it appears from the Boliek opinion that the defendant in that case presented both ineffective assistance of counsel and due process claims concerning his tattoo, but the Boliek court ultimately analyzed only the ineffective assistance of counsel claim. See Boliek , 912 F.Supp. at 1212.

As the Magistrate Judge observed, a procedural default may be excused if Charleston can show cause and prejudice or that a failure to consider the claim result in a fundamental miscarriage of justice, but here Charleston has not presented any grounds to excuse the default.

Pennsylvania Rule of Appellate Procedure 2119(a) requires that arguments "shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part-in distinctive type or in type distinctively displayed-the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent." Pa. R.A.P. 2119(a). Pennsylvania courts have held that, under this Rule, the failure to develop an adequate argument in an appellate brief may result in waiver of the claim. See Com. v. Beshore , 916 A.2d 1128, 1140 (Pa. Super. Ct. 2007) ; see also Vaughter v. Fisher , No. CIV.A. 12-00493, 2014 WL 1152540, at *9 (E.D. Pa. Mar. 24, 2014) ("The Pennsylvania waiver doctrine is, essentially, an appellate pleading standard requiring that a party set forth authority and factual details of a claim in a manner allowing for meaningful review....Meeting this standard has been recognized by the Third Circuit to constitute a procedural requirement.").

In Rolan , the Pennsylvania Superior Court had determined that the habeas corpus petitioner waived certain claims when he failed to comply with Rules 1925(d) and 2119(a) of the Pennsylvania Rules of Appellate Procedure. 680 F.3d at 319. The federal district court adopted the Superior Court's rationale, but the Third Circuit Court of Appeals disagreed, holding that the petitioner had shown "substantial compliance" with these rules and that the Superior Court's finding of waiver should not preclude the federal court's consideration of the petitioner's claims. Id.

In the alternative, the Magistrate Judge determined that even if Charleston's counsel "lacked a strategic reason to not request another instruction, Charleston cannot establish that there is a reasonable probability that there would have been a different result had counsel done so," in view of the ballistics evidence and testimony from the medical examiner that contradicted Charleston's testimony about the circumstances of the shooting. R & R at 36 n.24. Further, the Magistrate Judge determined that Charleston's defense "was undermined by his initial denial of any knowledge of the incident ... and his failure to seek help for the victim after the shooting, maintaining that he did not know Mr. Stanton had been shot, despite the fact that he was lying motionless and unresponsive on the floor." Id.

In her dissenting opinion, Judge Olson concluded that "a reasonable reading of the limiting instruction requires an acknowledgment that the instruction was equivocal." Charleston , 94 A.3d at 1031 (Olson, J., concurring and dissenting). Accordingly, "[i]f the jury followed the trial court's instruction with respect to Clara Stanton's testimony, it could have considered the hearsay portion of her testimony as proof of the truth of the matter asserted since the trial court's instruction did not foreclose this approach," a result that "would defeat the fundamental purpose of the limiting instruction." Id. at 1033.

Strickland v. Washington , 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under Strickland , "[a] convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction ... has two components. First, the defendant must show that counsel's performance was deficient....Second, the defendant must show that the deficient performance prejudiced the defense." Id. at 687, 104 S.Ct. 2052. Here, the Superior Court applied the standard set forth in the Pennsylvania case of Commonwealth v. Pierce , 515 Pa. 153, 527 A.2d 973, 975 (1987), which is equivalent to the Strickland standard. See Boyd v. Waymart , 579 F.3d 330, 334 n.2 (3d Cir. 2009) ("The Pennsylvania Supreme Court has made clear that the standard for ineffective assistance of counsel under Pennsylvania law ... is the same as Strickland's standard ... so a Pennsylvania court has adjudicated a Strickland claim on the merits where it has applied the state-law standard to that claim.").

The Court also agrees with the Magistrate Judge's determination that even if Charleston's counsel had requested another instruction, Charleston cannot establish that there is a reasonable probability that there would have been a different result.

The trial jury instructed the jury on murder of the first degree, second degree, and third degree. He also instructed the jury on self-defense.
Under Pennsylvania law, the jury may convict a defendant of involuntary manslaughter where the victim's death was "a direct result of the doing of an unlawful act in a reckless or grossly negligent manner, or the doing of a lawful act in a reckless or grossly negligent manner." 18 Pa. Cons. Stat. § 2504(a).
At the state level, Charleston contended that his counsel should have sought instructions for both involuntary manslaughter and homicide by misadventure. Here, although Charleston mentions the homicide by misadventure claim in his Petition, he has not discussed this claim in his briefing and has not objected to the Magistrate Judge's determination that this claim was waived and lacks merit. Accordingly, the Court addresses only Charleston's claim concerning the involuntary manslaughter instruction.

In the alternative, the R & R agreed with the Superior Court's determination that Charleston would not be entitled to relief on this claim because the facts of the case did not support an involuntary manslaughter instruction.

The Magistrate Judge, by contrast, recommended also denying Charleston's third and fifth claims-namely, those related to counsel's failure to object to the instruction regarding Ms. Stanton's testimony and counsel's failure to request an involuntary manslaughter instruction-on procedural grounds. This Court, however, reached the merits of those claims.

With respect to the first claim, it is debatable whether Justice Kennedy's Seibert concurrence is "clearly established Federal law" for purposes of habeas corpus review, and it is debatable whether the omission of the Miranda warnings in this case was deliberate, particularly in view of the fact that the standards governing this analysis are unsettled. See Capers , 627 F.3d at 477 (observing that Justice Kennedy did not "explore how a court should determine when a two-step interrogation strategy had been executed deliberately."). Nevertheless, it is not debatable that the admission of Charleston's statement did not have a "substantial and injurious effect or influence in determining the jury's verdict" under Brecht . See Rainey v. Superintendent Coal Twp. SCI , No. CV 16-3184, 2016 WL 9410906, at *1 (3d Cir. Oct. 27, 2016) (denying COA where petitioner's "claims of trial court error are not debatable because he has not shown that the alleged errors had a 'substantial and injurious effect or influence in determining the jury's verdict' " under Brecht ). For this reason, a certificate will not issue for Charleston's first claim.

Charleston named John Wetzel, the Secretary of the Pennsylvania Department of Corrections as the Respondent in this case. Because Charleston is currently incarcerated at the Greene State Correctional Institution at Waynesburg ("SCI-Greene"), Robert D. Gilmore, the Superintendent at SCI-Greene, has direct custody of Charleston and I have replaced Mr. Gilmore as the Respondent in this case. See Rule 2(a) of the Rules Governing Section 2254 Cases (requiring the state officer with current custody to be named as the respondent).

I will discuss the trial evidence at length later in this Report.

On August 22, 2012, Charleston, through counsel, filed an amended PCRA petition challenging his sentence based on the then recently-decided Miller v. Alabama, 567 U.S. 460, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), in which the Supreme Court determined that it was constitutionally impermissible to sentence a juvenile to mandatory life imprisonment. Charleston does not pursue the Miller claim in his habeas petition and the evidence reflects that Charleston was 20 years old at the time of the shooting. N.T. 8/21/09 at 152.

The habeas petition is timely. Charleston's conviction became final on direct appeal on December 26, 2011, 90 days after the Pennsylvania Supreme Court's September 27, 2011 denial of his petition for review. See Kapral v. United States, 166 F.3d 565, 570 (1999) (conviction becomes final when time expires to seek next level of review on direct appeal); S.Ct. R. 13 (90 days to seek certiorari review). The statute of limitations ran from that date until Charleston filed his PCRA petition on February 2, 2012, 38 days later. The statute resumed running on December 23, 2014, when the Pennsylvania Supreme Court denied his petition for review in the PCRA matter. See Stokes v. Dist. Attorney of County of Philadelphia, 247 F.3d 539, 542 (3d Cir. 2001) (petitioner does not get benefit 90-day period to seek Supreme Court review in post-conviction proceedings). Charleston filed his habeas petition 87 days later on March 20, 2015, using a total of 125 of his 365-day limitations period.

Witness Tracey Leslie testified that Mr. Stanton was involved in the sale of drugs. N.T. 8/19/09 at 52.

Detective Nathan Williams retrieved Mr. Stanton's phone from Temple University Hospital. N.T. 8/20/09 at 133. He found a series of missed calls from the victim's mother and the victim's girlfriend beginning at 2:52 p.m. Id. at 141.

Ms. Sanders testified that her sister and niece lived next to Mrs. Stanton. N.T. 8/20/09 at 32.

Judge Overton instructed the jury that, "with regard to the evidence you just heard ... evidence is not necessarily to be accepted for the truth of the statements made by Ms. Sanders to Ms. Stanton." N.T. 8/20/09 at 116. Ms. Sanders denied having both conversations. Id. at 36.

Detective Singleton recalled seeing Charleston across the street from 2428 North 25th Street when he arrived just before 5:00 p.m. on the day of the shooting. N.T. 8/21/09 at 148.

Detective Singleton's trial testimony regarding Charleston's statement and the timing of the Miranda warnings was consistent with his suppression hearing testimony. N.T. 8/17/09 at 56.

Dr. Gulino explained that he could not determine the order in which Mr. Stanton sustained the wounds. N.T. 8/21/90 at 72.

This bullet entered the victim's chest 19 inches below the top of his head and exited his back 19 inches below the top of his head, indicating a horizontal shot. N.T. 8/21/09 at 74.

This claim was not waived in the state courts. On direct appeal, the Commonwealth argued that the issue was waived because Charleston had not argued it at the suppression hearing. Superior Ct. Direct Op. at 23. As the District Attorney now concedes, "in an abundance of caution, the Pennsylvania Superior Court addressed the claim on the merits at length." Doc. at 16. The Superior Court specifically stated,
While we could arguably deem [Charleston's] Miranda claim waived, we are loathe to do so due to the seriousness of the charges in this case and the fact that the record demonstrates that [Charleston] asserted Miranda claims before the trial court that challenged the admissibility of the statement he made to Detective Singleton on the basis that [Charleston] did not voluntarily waive his rights prior to giving the statement.
Superior Ct. Direct Op. at 23-24. The general rule is that when the state court addresses a federal claim in an alternative holding, the federal court will refrain from addressing the merits of the claim. See Harris v. Reed, 489 U.S. 255, 264 n.10, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) ("a state court need not fear reaching the merits of a federal claim in an alternative holding"). However, this rule only applies where the state court "explicitly invokes a state procedural bar rule as a separate basis for decision." Id. Here, the state court noted that the claim could be deemed waived, but declined to do so. Because the Superior Court did not rely on the waiver as a separate basis for its decision, this court is not bound by the waiver as an independent and adequate state ground

Curative measures could include a "substantial break in time and circumstances between the prewarning statement and the Miranda warning," or "an additional warning that explains the likely inadmissibility of the prewarning custodial statement." 542 U.S. at 622, 124 S.Ct. 2601 (Kennedy, J., concurring).

Justice O'Connor, speaking for four dissenters, rejected both the plurality and Justice Kennedy's opinions in favor of Elstad. According to the dissent, if the first statement was involuntary, the court should look to the Elstad factors to determine "whether the taint dissipated through the passing of time or a change in circumstances." Seibert, 542 U.S. at 628, 124 S.Ct. 2601 (O'Connor, dissenting).

The Supreme Court has utilized Marks in determining "clearly established" law for purposes of section 2254. See Panetti v. Quarterman, 551 U.S. 930, 949, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007) (applying Justice Powell's concurrence in Ford v. Wainwright, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) as the narrowest holding in plurality decision).

Because the state courts did not consider Charleston's claim under Justice Kennedy's analysis, I will apply de novo review to this limited portion of this claim. See Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001) (de novo standard applies when state court did not reach merits); Everett v. Beard, 290 F.3d 500, 507-08 (3d Cir. 2002) (apply de novo review when state courts failed utilize correct legal standard).

The record is not clear as to how much Charleston disclosed prior to receiving the warnings. The trial court's opinion can be read to imply that the detective read Charleston his rights immediately after he had obtained biographical information and before questioning Charleston about Mr. Stanton's murder. See Trial Ct. Op. at 25. The Superior Court corrected this interpretation of the evidence, stating that "Detective Singleton's testimony is unequivocal on the point of fact that he elicited a statement from [Charleston] incriminating himself in the murder prior to administering Miranda warnings." Superior Ct. Direct Op. at 25 n.3. In the absence of any other evidence, this description is insufficient to establish a purposeful technique designed to undermine Miranda.

The prosecutor elicited this evidence during cross examination of Charleston. N.T. 8/24/09 at 137.

It appears from the introduction to the claim that the petitioner in Boliek did raise both due process and ineffective assistance of counsel claims regarding the tattoo evidence. Boliek, 912 F.Supp. at 1212. However, the District Court addressed only the ineffectiveness claim.

Rule 2119 sets forth the requirements for the argument in an appellate brief. "The Pennsylvania waiver doctrine is, essentially, an appellate pleading standard requiring that a party set forth authority and factual details of a claim in a manner allowing for meaningful review." Vaughter v. Fisher, Civ. No. 12-493, 2014 WL 1152540, at *9 (E.D. Pa. Mar. 24, 2014) (citing Commonwealth v. Johnson, 604 Pa. 176, 985 A.2d 915, 924 (2009) ).
Courts within this district have consistently held that the failure to develop a claim in the Superior Court or to comply with Rule 2119 is adequate to support a finding that a claim is procedurally defaulted. See Rhoades v. Superintendent, Civ. No. 14-4321, 2015 WL 4976745, at *5 (E.D. Pa. Aug. 19, 2015) (Stengel, J., approving and adopting Report & Recommendation, Caracappa, M.J.) (issues not properly developed with citation to authority or legal discussion); Vaughter, 2014 WL 1152540, at *5-6 (noting that failure to properly address claims in appellate brief violates Rule 2119 and results in a waiver of claim); Williams v. Patrick, Civ. No. 07-776, 2012 WL 3549941, at *8 (E.D. Pa. Apr. 26, 2012) (Report & Recommendation, Sitarski, M.J., approved and adopted McLaughlin, J., Aug. 17, 2012); Kirnon v. Klopotoski, 620 F. Supp.2d 674, 684 (E.D. Pa. 2008) (Yohn, J.); Boggs v. DiGuglielmo, civ. No. 04-5882, 2006 WL 563025, at *3 (E.D. Pa. Mar. 6, 2006) (Brody, J. approving and adopting Report & Recommendation, Wells, M.J.).
The fact that the Superior Court also made reference to the merits of these ineffectiveness claims in alternative holdings does not prevent the federal court from determining that the claims are procedurally defaulted in this forum. Harris, 489 U.S. at 265 n.10, 109 S.Ct. 1038 ; see also Johnson v. Pinchak, 392 F.3d 551, 556 (3d Cir. 2004). Unlike my conclusion that Charleston's first claim was exhausted because the Superior Court did not make a finding that the claim was waived, supra at 649 n.13, here the Superior Court did make such findings.

To the extent Charleston's claim can be read to challenge the prosecutor's use of Nashua Sanders' statement as substantive evidence rather than for impeachment, the Superior Court also found the claim waived as well.
[Charleston] does not develop an argument or offer pertinent authority in support of the specific claim that the prosecutor used the statement improperly, or that trial counsel ineffectively failed to object for that reason. See Pa.R.A.P. 2119(a) ; see also Commonwealth v. Behsore, 916 A.2d 1128, 1140 (Pa. Super. 2007), appeal denied, 603 Pa. 679, 982 A.2d 509 (2009) ("We shall not develop an argument for [the appellant], nor shall we scour the record to find evidence to support and argument; consequently, we deem this issue waived.").
Superior Ct. PCRA Op. at 1031-32.

As recited previously, supra at 646-47, Clara Stanton, the victim's mother, testified that sometime after her son's death, Nashua Sanders told her that, about a week prior to Mr. Stanton's death, Charleston told her that he planned to rob Mr. Stanton. N.T. 8/20/09 at 111-12. Ms. Sanders testified that Charleston had not said such a thing and denied having told this to Ms. Stanton. Id. at 35-36. Following Ms. Stanton's testimony, the trial court gave a limiting instruction.
Ladies and gentlemen, with regard to the testimony that you just heard, I'm just going to give you an instruction and that evidence is not necessarily to be accepted for the truth of the statements made by Ms. Sanders to Ms. Stanton, okay. It doesn't-they were statements and you will be given additional instructions at the appropriate time.
Id. at 116. No further instruction regarding this statement was included in the closing instructions. Charleston argues that the term "necessarily" rendered the instruction erroneous and prejudicial.

Charleston's claim would fail the Strickland test on the merits. Even if counsel lacked a strategic reason to not request another instruction, Charleston cannot establish that there is a reasonable probability that there would have been a different result had counsel done so. As discussed, Charleston's defense was based on self-defense, but the ballistics evidence and testimony from the Medical Examiner contradicted Charleston's testimony regarding the circumstances of the shooting. Compare N.T. 8/24/09 at 103-10 (Charleston describing wrestling with the victim and holding the victim's arm and hand while the victim was holding the gun and it going off three times) with N.T. 8/21/09 at 77-79 (based on the gunpowder residue, Dr. Gulino testified that two of the three shots were not contact wounds, the shot to the thigh originated from at least two feet away, and the shot to the chest was a horizontal shot); N.T. 8/21/09 at 132-33 (Officer Grandizio describing the jamming of the gun if any obstruction to the slide). Additionally, Charleston's defense was undermined by his initial denial of any knowledge of the incident, N.T. 8/19/09 at 169, 172, and his failure to seek help for the victim after the shooting, maintaining that he did not know Mr. Stanton had been shot, despite the fact that he was lying motionless and unresponsive on the floor. N.T. 8/24/09 at 114-16.

Charleston would not be entitled to relief on this claim in any event. The Pennsylvania Supreme Court has held that "a trial court shall only instruct on an offense where the offense has been made an issue in the case and where the trial evidence reasonably would support such a verdict." Commonwealth v. Browdie, 543 Pa. 337, 671 A.2d 668, 674 (1996). Here, the Superior Court noted in an alternative holding that the facts did not support a charge for misadventure. Superior Ct. PCRA Op at 1042-43. Homicide by misadventure is defined as "the accidental killing of another, where the slayer is doing a lawful act, unaccompanied by any criminally careless or reckless conduct." Superior Ct. PCRA Op. at 1025 n.16 (quoting Commonwealth v. Legg, 551 Pa. 437, 711 A.2d 430, 432 n.2 (1998) ). Considering Charleston's testimony that the shooting occurred during an argument about illegal drugs, and the forensic and ballistics evidence calling Charleston's account of the events into question, homicide by misadventure is inapplicable. See Superior Ct. PCRA Op. at 1025 n.18 ("the proposition that an instruction on homicide by misadventure would have likely resulted in a different verdict is remote to the extreme"). Likewise, the Superior Court found no basis for an involuntary manslaughter charge "absent evidence that tended to show Charleston acted recklessly or with gross negligence in causing death." Superior Ct. PCRA Op. at 1027 (citing 18 Pa. C.S.A. § 2504(a) ).
Finally, the Superior Court noted that "[t]rial counsel's strategic decision not to pursue competing theories of homicide by misadventure or involuntary manslaughter with requested instructions had a reasonable basis." Superior Ct. PCRA Op at 1027.
Here, after initial denials, from his first substantive statement to the police, to his testimony at trial, despite numerous inconsistencies, variations and other discrepancies, [Charleston] maintained that he acted in self-defense. On review, we discern no basis to find trial counsel ineffective, based on the information supplied by [Charleston], for pursuing his claim of self-defense and presenting the jury with a consistent theme and strategy of the case.
Id. at 1028.

The trial judge used similar verbiage in instructing the jury concerning its consideration of Commonwealth witness David Taylor's testimony, referring to evidence of his prior robbery conviction as evidence that his reputation for telling the truth was bad. N.T. 8/24/09 at 232.